**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (3d) 170124-U

Order filed April 23, 2020

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2020

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 10th Judicial Circuit, Peoria County, Illinois, |
| Plaintiff-Appellee, | ) | |
| | ) | Appeal No. 3-17-0124 |
| v. | ) | Circuit No. 07-CF-111 |
| | ) | |
| JACKIE LEE WILLIAMS, | ) | Honorable |
| | ) | John P. Vespa, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE WRIGHT delivered the judgment of the court.
Presiding Justice Lytton and Justice McDade concurred in the judgment.

**ORDER**

¶ 1     *Held*:  The trial court's evidentiary rulings did not serve to violate defendant's constitutional rights and the State's evidence was sufficient to sustain defendant's convictions. Further, the record is not sufficiently developed for a review of defendant's constitutional sentencing claims.

¶ 2     Defendant, Jackie Lee Williams, appeals his convictions of first degree murder and attempt armed robbery following his second jury trial. On appeal, defendant challenges the sufficiency of

the State's evidence, several evidentiary rulings made by the trial court, and the sentence imposed by the trial court.

¶ 3                                        I. BACKGROUND

¶ 4        On February 20, 2007, the State charged defendant by way of indictment with three counts of first degree murder and one count of attempt armed robbery.[1] On April 30, 2008, a jury found defendant guilty of first degree murder and attempt armed robbery. In 2010, this court affirmed defendant's conviction on direct appeal in *People v. Williams*, No. 3-08-0537 (2010) (unpublished order under Illinois Supreme Court Rule 23). On June 29, 2011, defendant filed a postconviction petition, which the trial court summarily dismissed. This court reversed the trial court's dismissal in *People v. Williams*, 2013 IL App (3d) 110808-U and remanded defendant's case for further proceedings. On June 12, 2015, the trial court granted defendant's petition for postconviction relief and vacated defendant's convictions. Defendant was remanded to the Peoria County Sheriff to await trial.

¶ 5        Defendant's second jury trial began on December 5, 2016. The State began their case in chief by calling Frankie Ratliff. Ratliff testified that David McCreary (the victim), nicknamed

---

[1]Count I alleged that defendant, Gabriel Shelton, and Demarco Spencer committed the offense of first degree murder in that "they, while attempting to commit a forcible felony bein [*sic*] armed robbery in violation of Chapter 720 Act 5 Section 18-2(A)2 of the Illinois compiled statutes shot [the victim] with a handgun, thereby causing the death of [the victim]." 720 ILCS 5/9-1(a)(3) (West 2006). The record indicates that the State dismissed count II in open court on April 28, 2007. Count III alleged that defendant, "while attempting to commit a forcible felony being armed robbery in violation of Chapter 720 Act 5 Section 18-2(A)2 of the Illinois compiled statutes personally discharged a handgun at [the victim] thereby causing the death of [the victim]." 720 ILCS 5/9-1(a)(3) (West 2006) Count IV alleged that defendant, Shelton, and Spencer, "with the intent to commit the offense of armed robbery in violation of Illinois compiled statutes, Chapter 720 Act 5 Section 18-2(A)2 performed an act which constitutes a substantial step toward the commission of that offense in that they knowingly and without lawful authority entered into the residence of [the victim] while armed with ahandgun [*sic*] and demanded property from [the victim] with the intent to take property from the person or presence of [the victim] by threatening the imminent use of [force] in violation of 720 ILCS 5/18-2(a)(2)[.]" 720 ILCS 5/18-2(a)(2) (West 2006).

Frosty, was Ratliff's best friend. On January 25, 2007, Ratliff, the victim, Carolyn Crosswhite, and two young children were at the victim's home at 2509 West Marquette Street.

¶ 6        Around 8 p.m. that evening, Ratliff was in the front room and the victim was in the kitchen. Ratliff heard a knock on the front door and heard a female's voice. The victim answered the door and exclaimed, "It's a hit, man." Ratliff saw two armed African American men come through the front door with their faces covered such that Ratliff could only see their eyes. Ratliff saw a couple of guns and heard two or three gunshots within three or four seconds after the front door opened. Ratliff indicated that a third individual was standing to the side of the front door, but Ratliff could not see if the individual was male or female. After carrying the children to a back room where Crosswhite was located and handing Crosswhite his phone so that she could dial 911, Ratliff returned to the front room and noticed the victim locking the front door. The victim had a hole in his face and a lot of blood on his chest. On cross-examination, Ratliff admitted that he had smoked marijuana around 7 or 7:30 p.m. that evening. Ratliff testified that he did not previously testify that the victim stated, "It's a hit, man," because no one asked him that question. Ratliff was unsure whether he had previously indicated that he saw more than one gun. Ratliff did not recall observing an individual curled up on the ground during the incident.

¶ 7        Carolyn Crosswhite testified that on the evening of January 25, 2007, between 7:30 and 8 p.m., she was at the victim's home with her then boyfriend, Ratliff, the victim, and two children. Crosswhite braided one of the children's hair in the dining room next to the kitchen while the victim cooked dinner. The victim took a telephone call and Crosswhite heard what sounded like a "girl's voice." Approximately 30 minutes later, there was a knock on the front door. Crosswhite called for the visitor to come in several times before telling the victim someone was at the front door. As soon as the victim reached the front door, a man with a black or blue bandana over his

3

face and a gun in his hand pushed through the door and began fighting the victim. Crosswhite, who was sitting in a roll-away chair with one of the children, rolled back into a bedroom. Ratliff brought the other child and a phone to Crosswhite. Crosswhite heard tussling through the wall and three or four gunshots. Crosswhite testified that she only saw one person come into the home. Crosswhite could not see anything but the intruder's eyes.

¶ 8         Katissue Warfield testified that on October 31, 2007, she plead guilty to the felony offense of attempt armed robbery in connection with the instant case. Warfield explained that she agreed to testify against defendant in the case in exchange for the dismissal of the first degree murder charge against her and a twelve-year day-for-day sentence for attempt armed robbery. Warfield had completed the 12-year sentence at the time of the instant trial. Warfield testified that in early 2007 she lived in Peoria with her three children, her sister Kimbula, Kimbula's two children, and defendant (nicknamed Black Jack). Defendant was Warfield's boyfriend at the time.

¶ 9         For three years prior, Warfield had been buying marijuana from the victim, whom she knew as Frost, for personal use. In January 2007, Warfield called the victim to discuss her and defendant purchasing two pounds of marijuana from the victim. Warfield indicated this was not a typical quantity of marijuana she would purchase from the victim. The victim agreed to sell Warfield and defendant the marijuana. Warfield speculated that the marijuana would cost $2000 and stated that defendant was going to pay for the marijuana. Defendant did not have the money to pay for the marijuana at the time of the call.

¶ 10        Two or three days later, around 1 p.m. on January 25, 2007, Warfield used her cell phone to call the victim and arranged to pick up the marijuana that evening. Defendant was with Warfield when she placed the call to the victim. Warfield testified that she did not have the money to buy the marijuana and had not seen defendant with the money to buy the marijuana. Over the course

4

of the next 15-30 minutes, defendant left the home and then called Warfield to come outside. Warfield entered a tan vehicle driven by Gabriel Shelton. Defendant rode in the passenger seat. The group drove and picked up Demarco Spencer at the Harrison Homes. Spencer brought a black and brown gun into the vehicle and gave the gun to defendant. Warfield did not see defendant give the gun to anyone else. Defendant wore all black and Spencer wore a black shirt and blue jeans.

¶ 11        Next, Warfield called the victim and told him she was on the way to pick up the marijuana. After parking, Warfield, defendant, and Spencer exited the vehicle. Shelton remained in the vehicle as the driver. Warfield described the front of the victim's house as having a built-in front porch. As Warfield walked up to the victim's front door, she noted that defendant wore gloves and had a black and white bandana tied around his face while Spencer had his shirt pulled over his face. Each man's face was covered from the nose down. Once all three individuals were on the porch, Warfield knocked on the door. Warfield heard the victim say come in. Warfield could hear the victim approaching so she opened the door. Suddenly, Spencer pushed Warfield to the floor. Warfield felt people fighting as she laid on the ground. Warfield heard two gunshots and ran away toward her home.

¶ 12        Before she reached her home, Shelton and defendant picked Warfield up in the car. Warfield informed defendant that she lost her phone. The State presented Warfield with State's exhibit No. 11, which Warfield identified as her pink cell phone. Upon arrival at the home, Warfield asked defendant what happened, and defendant stated, "He should have gave it up." Warfield and defendant discarded their clothing in a garbage can. The next day Warfield learned the victim had been killed. If questioned by police, defendant told Warfield to say that when she went to "get some weed two boys made [her] go to [the victim's] house and pushed [her] in the house and that's how I lost my phone."

¶ 13    Two days later, Warfield went to the Peoria Police Department. Initially, Warfield recounted the false story to the detectives in accordance with defendant's instructions. However, Warfield had a change of heart and told the detectives the truth about what happened. Warfield smoked marijuana before going to the victim's house that night.

¶ 14    Shawn Curry, a detective with the Peoria Police Department, testified that on the night in question he was dispatched to the victim's residence to investigate a report of a shooting. When Curry arrived, he travelled through the screened-in porch and witnessed the victim trying to pull himself up using a couch as leverage just inside the front door. The victim had sustained a gunshot wound to the face. As Curry attempted to administer medical aid, he kept asking the victim what happened, who shot him? Curry thought the victim stated, "Kadia," but struggled to understand the victim who had blood and foam running from his mouth. Curry also noticed a woman at the scene and two young children crying.

¶ 15    Eric Ellis, an officer with the Peoria Police Department, testified that he was dispatched to the victim's home with Officer Scott Bowers. Ellis revealed that the standard procedure of the Peoria Police Department was to conduct a thorough search of the crime scene, looking for items of evidentiary value. Ellis photographed the scene and observed a pink cell phone on the floor. Ellis photographed several projectile holes in the walls of the residence and observed a bullet lodged in the wall, which Bowers removed and collected. Ellis did not find any latent evidence of finger or palm prints in the home. Nothing found in the house indicated the presence of two pounds of marijuana, though drug paraphernalia was located in the kitchen. At the time of the search, Ellis did not know the shooting was drug related, so the officers' search of the residence did not include searching all the places in the home that marijuana could have been located.

¶ 16 Scott Bowers testified that he worked in the crime scene unit of the Peoria Police Department and was dispatched to the victim's home on January 25, 2007, after receiving a report of a shooting. Bowers located a fired bullet inside the west living room wall of the home, which Ellis identified as State's exhibit No. 10. Bowers also identified State's exhibit No. 14 as a bullet removed from the victim's body.

¶ 17 Two days later, Bowers was dispatched to the 2400 block of Antionette, a few blocks from the victim's home, where a handgun had been located in an alley. Bowers located a purse inside of a blue garbage can. Inside the purse was a .357 revolver. Bowers identified State's exhibit No. 21 as the gun he located. There were no fingerprints on the gun. Bowers opened the cylinder of the gun and found that three cartridges had been fired and three had not been fired. Bowers returned to the victim's home on February 21, 2007, and discovered another bullet lodged in the west wall, which he identified as State's exhibit No. 22.

¶ 18 On cross-examination, Bowers testified that the search of the victim's residence concentrated mainly in the front living room area, the porch, and just outside the residence. Officers did not go through the entire residence. Bowers did not recall seeing any large bags of suspected marijuana. Bowers lastly testified that the examination of a tan-colored Dodge Intrepid, which detectives suspected was utilized in connection with the crime, revealed nothing of evidentiary value.

¶ 19 Linda Yborra, a retired firearm and tool mark examiner for the Illinois State Police, testified as an expert witness. Yborra identified State's exhibit No. 21 as a Smith and Wesson .357 Magnum caliber revolver and a set of test shots. Yborra further identified State's exhibit Nos. 10 and 14, each containing a fired bullet. After examination and test-firing, Yborra determined that

the projectile recovered from the wall and the projectile recovered from the body of the victim were fired from State's exhibit No. 21, the .357 Magnum caliber revolver.

¶ 20        Next, the State called Demarco Spencer. Spencer testified that he was convicted of the first degree murder of the victim and was currently serving a 44-year prison sentence. However, Spencer attempted to "Plead the Fifth" to several questions. The trial court instructed the jury to leave the courtroom and ordered Spencer to testify by answering the prosecutor's questions. Spencer, fearing for his own life, refused to cooperate. The trial court held Spencer in direct criminal contempt and advised Spencer that he could receive an additional 10 years in prison for refusing to testify. The State informed the court that it intended to continue its questioning of Spencer in order to lay a foundation for impeachment. Defense counsel objected and argued that Spencer's refusal to answer questions would serve to deprive defendant of his right to confrontation.[2] The trial court overruled defense counsel's objection.

¶ 21        Once the jury returned to the courtroom, the State asked Spencer several questions related to his prior sworn testimony from his own jury trial in February 2008. Again, Spencer asserted his perceived fifth amendment privileges by responding with silence to prosecutor's questions about whether Spencer remembered testifying at his own trial on February 13, 2008, that: (1) Gabe Shelton told Spencer that Shelton and a friend of his had been "shorted" one-half pound of marijuana in a drug deal with the victim; (2) Shelton told Spencer he needed a gun; (3) Spencer obtained a gun; (4) Spencer gave the gun to "Jackie;"[3] (5) Spencer was present at the victim's

_____

[2]Defense counsel mounted a standing objection to the entirety of Spencer's testimony.
[3]At this point, Spencer was removed from the courtroom and placed in a holding cell in order to move the trial along. Following this recess, Spencer refused to return to the courtroom from the holding cell. Consequently, the court directed court staff to house Spencer in the county jail for the night. The record also shows that while housed in the jail, Spencer spoke with counsel the court appointed for Spencer. We note that the State called several witnesses in the interim. However, in the interest of clarity, we include all of Spencer's testimony as though it was given continuously.

home with Jackie and a female on the night in question; (6) Jackie was wearing a bandana on his face; (7) Jackie "rushed in the crib;" (8) when Spencer got through the doorway he covered his face; (9) Jackie and the victim were "tussling" over the gun; (10) Spencer heard a shot; (11) Spencer assisted the police in retrieving the gun; and (12) Spencer told the police he got the gun from a woman named Breela.

¶ 22        During cross-examination by defense counsel, Spencer responded to defense counsel's inquiries about Spencer's 2008 jury trial by explaining that his testimony during his own jury trial was designed to protect himself and that the statements he made in his defense were not true. When asked whether Spencer had "an actual memory of the events of what we're talking about here[,]" Spencer responded to defense counsel by stating, "No, actually I don't." Spencer told defense counsel that "[they] [t]ried to show me all, all — um, um, the things, whatever the, um, statement whatever yesterday, but I didn't — I ain't want to look at it because I didn't come up here to answer no questions in the first place." Spencer explained to defense counsel that Spencer had an argument with the victim "over some weed or whatever, about some finance" in the two or three weeks leading up to the night in question. When asked whether he remembered telling the victim, "That this is not the end of it," Spencer became agitated, denied he made the statement, and corrected his testimony from moments earlier by claiming the argument did not happen and that he did not have a problem with the victim.

¶ 23        Next, the parties and the court approved a procedure for publication of the certified transcript from Spencer's 2008 jury trial. Defense counsel stipulated to the authenticity of the transcripts and cited no need to call court reporters to establish their authenticity. Portions of Spencer's prior trial testimony were read into the record by having a prosecutor and a mock witness read questions and answers from the transcript *verbatim* to the jurors.

¶ 24        Shannon Walden, a former detective with the Peoria Police Department in 2007, testified that she investigated the crime scene at the victim's home and recovered a pink cell phone, State's exhibit No. 6. Walden also recovered State's exhibit No. 11, the victim's cell phone, whose phone number was 712-4161. Walden initially traced the pink cell phone to Kimbula, Katissue Warfield's sister. Katissue Warfield arrived at the Peoria Police Department while Walden was interviewing Kimbula and Walden had a conversation with Katissue.

¶ 25        On the evening of January 27, 2007, Walden had a video-recorded conversation with Spencer at the Peoria Police Department. At some point during the conversation, Walden allowed Spencer to make a cell phone call where Walden could hear a female voice on the other line. Then, at Spencer's direction, Walden, his partner, and Spencer traveled to an alley on the 2400 block of Antoinette. Spencer directed law enforcement to a garbage can where officers located a purse with a handgun inside. On re-direct examination, Bowers testified that the female voice she heard on the telephone was not Katissue or Kimbula's voice.

¶ 26        James Feehan, a digital forensics examiner, testified as an expert. Feehan conducted a forensic analysis on the pink cell phone found at the scene and compiled call logs from the phone. The calls logged on January 25, 2007, included an incoming call to the Warfield's cell phone from a contact bearing defendant's name at 7:37 p.m., an outgoing call from the Warfield's cell phone to the victim at 7:52 p.m., and five missed incoming phone calls from a contact bearing defendant's name to Warfield's cell phone from 8:04 p.m. to 9:36 p.m.

¶ 27        Next, the parties stipulated to the admission of the autopsy findings and testimony of Dr. Violette Hnilica. The recorded video deposition of Dr. Hnilica was published to the jury.

¶ 28    The State called Gabe Shelton to testify.[4] Shelton stated that he was being forced to testify and informed the court of threats he had received.[5] Shelton testified that he was convicted of attempt armed robbery in relation to the instant case. Shelton stated that he grew up with defendant and had known him for 25 years. Shelton also knew Spencer.

¶ 29    Shelton stated that he remembered giving a videotaped statement to law enforcement on January 28, 2007, but did not remember the content of the statement and declined to review the videotaped statement. Shelton did not recall telling law enforcement during the interview that (1) he, Spencer, and defendant met at Atlanta Wings and A Prayer, where the group discussed a robbery; (2) defendant told Spencer "he got a lick for you, [the victim];" (3) defendant asked Spencer to provide Shelton with a gun to commit the robbery; (4) Shelton drove defendant, Spencer, and Warfield to the victim's residence in Shelton's grandmother's gold Intrepid that night; (5) and defendant told Warfield to call the victim and tell the victim they were on the way.

¶ 30    On cross-examination by defense counsel, Shelton reiterated that he was forced to testify. Shelton stated that he did not remember making any statements to law enforcement about the victim's death, that the statements were untrue, and that he was doing a lot of heroin at the time.

¶ 31    The State recalled Shannon Walden to testify concerning Shelton's audio and video-recorded interview on January 28, 2007. Walden testified that he reviewed the recording of the interview, and the video was admitted into evidence and published to the jury. Due to technical difficulties, Walden testified to the contents of the video to confirm Shelton's prior statements to law enforcement. At this time, the State rested.

---

[4]Defense counsel also raised a standing objection to Shelton's testimony.
[5]During the trial, both Shelton and Spencer consulted with attorneys concerning the implications of their decision not to testify.

¶ 32     Defendant presented evidence in the form of a stipulation that if called to the stand, Detective Keith McDaniel would testify that during his two January 2007 interviews of Ratliff, Ratliff did not indicate that he heard anyone announce, "[i]t's a hit." Ratliff also told McDaniel that he only saw one gun that night.

¶ 33     Defendant called Lillie Mae Griffin, the victim's mother, to testify. Griffin testified that two to three weeks before the shooting she witnessed a heated verbal argument between Spencer and the victim outside of a store. When asked what Spencer said during the argument, the State objected on hearsay grounds, whereupon the parties discussed the State's objection outside the presence of the jury. Defense counsel informed the court that Griffin would likely testify, based on her previous statements in the coroner's inquest,[6] that during the argument Spencer told the victim, "This is not the end of it," among other comments. Defense counsel purported to offer Griffin's testimony to show that Spencer was correctly convicted of murder as a result of Spencer's jury trial and Spencer's conviction meant the jurors could conclude defendant was not involved in the victim's death. Defense counsel told the court that counsel was not offering the statement to prove the truth of the matter asserted, but rather to establish that Spencer had a motive to harm the victim. In addition, defense counsel argued this out-of-court statement would impeach Spencer's current denial, during defendant's jury trial, that he had any verbal disagreement with the victim. The court stated that it would not allow Griffin to testify that she heard Spencer tell the victim, "This is not the end of it," because defense counsel was offering the statement to ultimately prove that Spencer shot the victim.

¶ 34     Following closing argument, the jury found defendant guilty of attempt armed robbery and first degree murder. However, the jury did not find that defendant was armed with or personally

---

[6]Defense counsel indicated that this statement was not a sworn statement.

discharged a firearm that proximately caused the death of another person during the commission of the offense.

¶ 35    On February 10, 2017, defendant filed an amended motion for judgment notwithstanding the verdict or, alternatively, for a new trial, which the trial court denied. The trial court sentenced defendant to serve a term of 50 years in the Illinois Department of Corrections. Defendant's motion to reconsider his sentence was denied. Defendant appeals.

¶ 36                                          II. ANALYSIS

¶ 37    For purposes of this appeal, defendant raises multiple issues for our review. Defendant asserts the State did not meet its burden to prove the underlying felony offense of attempt armed robbery beyond a reasonable doubt. Since the State did not prove the underlying felony offense, defendant argues the State did not prove the most serious charged offense of felony murder beyond a reasonable doubt. On this basis, defendant requests our court to reverse his conviction. Defendant also contends several of the trial court's evidentiary rulings were erroneous and warrant a new trial. Finally, if this court affirms defendant's conviction for felony murder and denies defendant's request for a new trial, defendant contests the constitutionality of the sentence imposed by the trial court.[7] We begin by addressing the trial court's evidentiary rulings before addressing the sufficiency of the evidence and the sentencing issues.

¶ 38                    A. The Admission of Spencer's Prior Sworn Testimony

¶ 39    The record reveals that Spencer testified in his own defense during his 2008 jury trial pertaining to these events. At the conclusion of Spencer's 2008 trial, the jury found Spencer guilty of attempt armed robbery and first degree murder. In 2016, the State called Spencer to testify in

---

[7]On July 18, 2018, this court entered an order striking defendant's initial brief which contained a statement of facts in excess of 15 pages. On September 13, 2018, with leave of the court, defendant filed a new brief raising several additional issues. The State's brief, filed May 24, 2019, addressed all issues raised in both briefs defendant submitted to this court.

defendant's jury trial for the same charged offenses. At the time Spencer testified as a State's witness against defendant, Spencer was serving a 44-year sentence in the Illinois Department of Corrections for his convictions.

¶ 40    Spencer was an uncooperative witness for the State during this defendant's 2016 jury trial. For example, Spencer initially invoked his fifth amendment right to remain silent in response to many of the State's questions on direct examination. Spencer also refused to answer the State's questions pertaining to Spencer's own prior sworn testimony made during Spencer's jury trial in 2008.

¶ 41    After Spencer failed to respond to the first series of questions by the prosecutor, the court excused the jury. At this time, the court ordered Spencer to remain in a holding cell while the court and counsel debated how to properly approach Spencer's refusal to testify based on the fifth amendment. After the discussion with the court and counsel, Spencer refused to return to the courtroom from the holding cell. Consequently, the court directed the court staff to house Spencer in the county jail for the night. The record also shows that while housed in the county jail, Spencer spoke with court-appointed counsel. Spencer returned to the courtroom to testify the next day.

¶ 42    During the second day of Spencer's 2016 testimony as a State's witness against this defendant, Spencer answered some of the prosecutor's questions but invoked his fifth amendment rights on others. Similarly, without invoking his fifth amendment rights, Spencer responded to some but not all of defense counsel's questions during cross-examination. In fact, during cross-examination, Spencer explained to defense counsel that Spencer's prior testimony in 2008 was untrue. Spencer also told defense counsel that Spencer had no current recollection of his prior testimony from his own 2008 jury trial that resulted in his conviction. Later in the trial, the parties agreed the transcript of Spencer's prior sworn testimony from his 2008 jury trial was accurate. The

parties also agreed on the best procedure to publish the transcript from 2008 for the jury's consideration in defendant's jury trial.

¶ 43     With this background in mind, we turn to defendant's argument that the trial court committed reversible error due to the evidentiary ruling allowing the State to introduce portions of Spencer's prior 2008 sworn testimony as part of the State's case against this defendant in 2016. In short, defendant contends the transcript of Spencer's prior 2008 testimony in his own defense should not have been introduced either as substantive evidence or to impeach Spencer during this defendant's 2016 jury trial. Based on this alleged error pertaining to Spencer's testimony, defendant argues he is entitled to a new trial on four separate grounds, which we address successively below.

¶ 44     Generally, a trial court's evidentiary rulings are reviewed for an abuse of discretion. See *People v. Sutherland*, 223 Ill. 2d 187, 272 (2006). A trial court abuses its discretion only where the court's ruling is arbitrary, fanciful, unreasonable, or where a reasonable person would not take the view adopted by the trial court. *Id*. at 272-73.

¶ 45                                  1. Foundation

¶ 46     Defendant submits that the State failed to establish a proper foundation for the admission of Spencer's prior sworn testimony. The State argues defendant failed to preserve this alleged error regarding a foundational deficiency. Defendant does not address the State's forfeiture argument in his briefs and does not request plain error review. It is well established that to preserve an issue for appellate review, a party must object to the claimed error at trial. *People v. Cohn*, 2014 IL App (3d) 120910, ¶ 25. Here, defendant failed to preserve this alleged foundational error for review by failing to object on this basis during trial, thus limiting our review of this error to review according to the plain error doctrine. Similarly, defendant has failed to address whether either of the two

prongs of plain error are satisfied and thereby forfeits plain error review for purposes of this appeal. *People v. Hillier*, 237 Ill. 2d 539, 546-47 (2010).

¶ 47 However, even if we were to reach the merits of this alleged foundational error, there was a stipulation and/or an express agreement between counsel for both parties that the foundational requirements could easily be fulfilled by the State. In other words, defense counsel conceded the authenticity of the transcripts from Spencer's 2008 jury trial. We conclude defendant's position on appeal, regarding an insufficient foundation for the introduction of the transcript, is unsupported by the record.

¶ 48                                                    2. Identification

¶ 49 Next, we briefly address the argument that Spencer's prior sworn testimony in 2008 did not include Spencer's in-court identification of the person Spencer referred to as "Jackie." Again, defense counsel did not raise an objection to the admission of the 2008 transcript based on the failure of Spencer to identify "Jackie" during Spencer's own jury trial. Consequently, defendant's arguments for a new trial on this basis are not persuasive.

¶ 50                                        3. Spencer's Fifth Amendment Rights

¶ 51 Defendant further asserts that the trial court committed reversible error by compelling Spencer to testify in violation of *Spencer's* fifth amendment rights. The State contends defendant lacks standing to raise this issue. We agree. The case law provides that this defendant lacks standing to complain about the violation of another person's constitutional rights. See *People v. McCarty*, 223 Ill. 2d 109, 155 (2006); See *Rakas v. Illinois*, 439 U.S. 128 (1978); See *People v. Adams*, 283 Ill. App 3d 520, 524 (1996).

¶ 52 Even if we ignore defendant's lack of standing to assert a violation of Spencer's fifth amendment rights on appeal, defendant's argument lacks merit. Here, Spencer's fifth amendment

16

rights were carefully considered and protected by the trial court. Following Spencer's invocation of his fifth amendment rights during defendant's jury trial in 2016, the trial court suspended Spencer's testimony until the next day. The court appointed counsel to assist Spencer. Further, after returning to the witness stand the next day, Spencer did not assert his fifth amendment rights before answering some, but not all, of the questions during defense counsel's cross-examination. For these reasons, we conclude this record does not contain a violation of Spencer's fifth amendment rights and defendant is not entitled to a new trial on this basis.

¶ 53                                4. Defendant's Sixth Amendment Rights

¶ 54            Finally, defendant claims a new trial is in order because Spencer's refusal to testify violated defendant's sixth amendment right to confrontation. We will review this issue *de novo*. *People v. Lovejoy*, 235 Ill. 2d 97, 142 (2009).

¶ 55            Generally, the sixth amendment's confrontation clause is satisfied where the defendant is given a full and fair opportunity to cross-examine the witness. *United States v. Owens*, 484 U.S. 554, 557-58 (1988). In some situations, a witness's refusal to answer questions may create reversible error where the refusal effectively adds critical weight to the State's case. *People v. Crawford Distributing Co., Inc.*, 78 Ill. 2d 70, 75 (1979). In such cases, the inability to cross-examine a State's witness, who chooses to remain silent during direct and cross-examination, could potentially inject reversible error into the record. *Id*. This is not the case here. On the second day of his testimony as a State's witness, Spencer chose to answer some critical questions posed by defense counsel during cross-examination without refusing to answer based on fifth amendment considerations.

¶ 56            Thus, Spencer did *not* remain silent and provided answers to selective questions posed by defense counsel. In fact, Spencer's responses were very helpful to the defense in this case. The

United States Supreme Court has held that a full and fair opportunity for cross-examination does not mean an examination in whatever manner, and to whatever extent, that a defendant may wish. *Owens*, 484 U.S. at 559. Instead, an effective cross-examination is had where matters such as witness's bias or lack of memory are elicited. *Id*.; *People v. Flores*, 128 Ill. 2d 66, 89-90 (1989).

¶ 57 An opportunity for effective cross-examination is well documented in this record. For example, Spencer testified on cross-examination that he had an argument with the victim concerning marijuana in the weeks leading up to the victim's murder. As such, Spencer's testimony demonstrated Spencer's bias and a possible vendetta against the victim before the jury. Spencer also told defense counsel that Spencer's prior testimony in his own defense was self-serving and false. In addition, Spencer provided inconsistent statements during cross-examination about his argument with defendant as well as claiming to have no memory of his testimony in 2008. Spencer's responses during cross-examination contain the hallmarks of an effective cross-examination including, but not limited to, Spencer's admission of prior false testimony about defendant's involvement, Spencer's prior dissatisfaction over a drug transaction with the victim, and Spencer's deficient memory of the details of the night in question. *Id*.; *Owens*, 484 U.S. at 559.

¶ 58 The law does not require that a witness's testimony must fulfill all of defendant's goals for the cross-examination of a witness. *Id*. at 558. Here, defendant was able to effectively cross-examine Spencer because the responses Spencer did provide to questioning by defense counsel supported the defense's theory that Spencer's prior testimony incriminating defendant was less than truthful and was not credible. Defendant had the opportunity to cross-examine Spencer here. Thus, defendant's sixth amendment right to confront the witnesses against him was not violated.

¶ 59                              B. Sufficiency of the Evidence

¶ 60         Defendant argues that the State's evidence failed to establish his guilt for felony murder beyond a reasonable doubt because the evidence did not prove the underlying felony offense of attempt armed robbery as required for the felony murder conviction. By way of review, the State charged defendant with felony murder in violation of 720 ILCS 5/9-1(a)(3) (West 2006) based on the underlying felony offense of attempt armed robbery. 720 ILCS 5/18-2(a)(2) (West 2006). Because defendant's challenge to the sufficiency of the evidence on the underlying offense is the sole basis for defendant's insufficiency claim, we confine our analysis to this very narrow challenge.

¶ 61         When faced with a challenge to the sufficiency of the evidence, it is not the function of the reviewing court to retry the defendant. *People v. Jimerson*, 127 Ill. 2d 12, 43 (1989). Rather, viewing the evidence in the light most favorable to the prosecution, a reviewing court is tasked with determining whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. *People v. Young*, 128 Ill. 2d 1, 49 (1989) (quoting *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979)). It is the responsibility of the trier of fact to determine the credibility of the witnesses, to weigh the witness testimony, to resolve conflicts in the evidence, and to draw reasonable inferences from the evidence. *People v. Williams*, 193 Ill. 2d 306, 338 (2000). Reviewing courts must give due consideration to the reality that the trier of fact saw and heard the witnesses and the evidence firsthand. *People v. Smith*, 185 Ill. 2d 532, 541 (1999). Ultimately, "The testimony of a single witness, if it is positive and the witness credible, is sufficient to convict." *Id*. A defendant's conviction will only be overturned based on insufficient evidence where the proof is so improbable or unsatisfactory that a reasonable doubt as to the defendant's guilt remains. *Williams*, 193 Ill. 2d at 338.

¶ 62      The State's evidence regarding defendant's specific intent to commit the underlying offense of attempt armed robbery was entirely circumstantial. Yet, it is well established that circumstantial evidence alone may be sufficient to establish specific criminal intent. The case law recognizes that intent is rarely proven by direct evidence and must be inferred from circumstantial evidence, such as the offender's conduct and the surrounding circumstances. *People v. Peterson*, 2017 IL 120331, ¶ 43. A person commits armed robbery when he or she takes property from the person or presence of another by the use of force or by threatening the imminent use of force and that person carries on or about his or her person or is otherwise armed with a firearm. 720 ILCS 5/18-1(a) (West 2006); 720 ILCS 5/18-2(a)(2) (West 2006).

¶ 63      The crux of defendant's sufficiency of the evidence argument, regarding defendant's criminal intent to commit attempt armed robbery, focuses on the credibility of Warfield's testimony. Defendant contends the State's evidence was insufficient to establish guilt beyond a reasonable doubt because defendant did not announce "it's a robbery" upon entering the victim's residence.

¶ 64      However, Warfield testified that she asked defendant what happened after the shooting. In response, defendant stated, "He should have gave it up." On appeal, defendant claims Warfield's testimony was less than credible and unworthy of belief because Warfield was an accomplice, and her testimony should have been completely rejected by the jury.

¶ 65      It is well established that the testimony of an accomplice is generally viewed with suspicion, especially where an accomplice witness received leniency or struck a deal for immunity from prosecution. *People v. Zambrano*, 2016 IL App (3d) 140178, ¶ 27. Nonetheless, even uncorroborated accomplice testimony may be sufficient to sustain a conviction. *Id.*, ¶ 26. If the jury found Warfield's testimony to be credible, then her testimony about defendant's incriminating

statement that the victim "should have gave it up" constitutes compelling evidence of defendant's specific intent to attempt to forcefully remove property from the victim. It was the jury's task to determine Warfield's credibility.

¶ 66 "A person commits an attempt when, with intent to commit a specific offense, he does any act which constitutes a substantial step toward the commission of that offense." 720 ILCS 5/8-4(a) (West 2006). "Whether a defendant's conduct constitutes a substantial step toward the commission of a specific crime is a question of fact that must be determined on a case-by-case basis from all of the unique facts and circumstances surrounding the events in question." *People v. Norris*, 399 Ill. App. 3d 525, 530 (2010).

¶ 67 For purposes of this appeal, defendant alleges the State's evidence did not establish defendant took a substantial step toward the commission of armed robbery. In particular, defendant claims the evidence does not show defendant made any attempt to remove property from the victim before leaving the residence. However, our supreme court recognizes that "it is not necessary that a defendant complete the last proximate act in order to be convicted of attempt." *People v. Terrell*, 99 Ill. 2d 427, 433 (1984). In other words, the State was not required to prove that defendant performed the last deed which would render the crime complete. *People v. Brown*, 75 Ill. App. 3d 503, 505 (1979).

¶ 68 According to Warfield, she followed defendant's instructions, telephoned the victim, and made arrangements to purchase and pick up a large quantity of marijuana from the victim, knowing neither she nor defendant had access to $2000. Warfield's cell phone was recovered by law enforcement at the scene. The telephone call logs compiled by law enforcement corroborated Warfield's testimony about the telephone calls she made to the victim and received from defendant that night.

21

¶ 69        On the night of the murder, Warfield witnessed defendant take possession of a gun from Spencer before defendant, Spencer, and Warfield exited the vehicle near the victim's residence. According to Warfield, at the time the trio approached the victim's porch, defendant wore a black and white bandana tied around his face such that his face was covered from the nose down. Warfield also testified that defendant wore gloves. Once on the porch of the residence with defendant and Spencer, Warfield opened the door, was knocked to the floor, and heard people fighting. This testimony, if found credible by the jury, provided strong evidence that defendant intentionally took a substantial step toward the commission of armed robbery.

¶ 70        Further, Ratliff and Crosswhite, guests in the victim's home at the time of the murder, corroborated portions of Warfield's testimony. Ratliff testified that he saw two men, each armed with separate guns, rush through the victim's front door on the night of the murder. Ratliff did not see a woman enter the residence. However, in addition to the two men, Ratcliff saw a third individual just outside the door on the porch. Similarly, another guest in the victim's home, Crosswhite, observed two male assailants and described a black bandana covering one assailant's facial features such that she could only see the assailant's eyes.

¶ 71        In addition to the eyewitness accounts from the occupants of the victim's apartment, the State offered Spencer and Shelton's live testimony, trial transcripts from Spencer's 2008 trial, and an officer's testimony concerning the contents of the videotaped statement Shelton made to law enforcement in 2007. For purposes of this analysis of the sufficiency of the evidence, we are unable to determine whether the jury found their testimony credible. Therefore, out of an abundance of caution, since Spencer and Shelton had previously been convicted of first degree murder and attempt armed robbery respectively, we elect not to consider the testimony of either Spencer or Shelton when measuring the sufficiency of the State's evidence.

¶ 72    Ultimately, we conclude the State's evidence was sufficient to prove the underlying felony offense beyond a reasonable doubt.

¶ 73                            C. The Testimony of Lillie Griffin

¶ 74    In the alternative, defendant urges this court to vacate his conviction and remand the matter for a new trial based on the trial court's finding that Griffin's proposed testimony that she overheard Spencer tell the victim, "This is not the end of it," was hearsay. The trial court's ruling on the admissibility of evidence will not be overturned absent an abuse of discretion. *People v. Caffey*, 205 Ill. 2d 52, 89 (2001).

¶ 75    Again, we focus our analysis on the narrow scope of defendant's formulation of this issue. Defendant argues Griffin's testimony was offered for purposes other than to prove the truth of the matter asserted, namely, as impeachment of Spencer, and to illustrate Spencer's animus toward the victim. Defendant argues, "The error is not harmless, as Spencer's prior testimony was one which directly placed the murder weapon in defendant's hands and was highly prejudicial."

¶ 76    Assuming only for purposes of swiftly resolving this issue that the trial court's evidentiary ruling was incorrect, it must be emphasized that Spencer admitted to this jury that he had given prior false testimony about the victim's death. Further, this jury was well aware that Spencer was serving a 44-year sentence for murdering this victim. It is hard to imagine stronger evidence of impeachment, based on a felony conviction, than a State's witness who admits he is a recently convicted murderer.

¶ 77    Furthermore, Griffin was allowed to testify that an argument between Spencer and the victim occurred in the weeks leading up to the murder. This jury was well aware that Spencer may have had an animus toward the victim. Based on this unique record, we conclude the excluded

evidence of impeachment offered during Griffin's testimony would have been cumulative and the error, if any, was harmless.

¶ 78                                    D. Sentencing

¶ 79                              1. The Trial Court's Inquiry

¶ 80        Defendant argues that the trial court erred by inquiring about defendant's previously suppressed statements during defendant's sentencing hearing in the instant case. The record reveals that during defendant's sentencing hearing, the State attempted to admit portions of defendant's videotaped interview from January 2007. Defense counsel objected on the grounds that this court previously found defendant's statements from the interview were inadmissible in *Williams*, 2013 IL App (3d) 110808-U. Based on the defense's objection, the State withdrew the request for the trial court to consider this evidence for purposes of sentencing. However, the prosecutor took time to explain to the court that during defendant's interview, defendant told detectives that he shot the victim and additionally detailed the circumstances surrounding the murder. Defendant posits that though the evidence was not actually viewed by the trial judge, the trial court was made aware of the statements, rendering the court potentially unable to properly shield its mind from the prejudicial effect of the evidence. Thus, defendant requests a new sentencing hearing.

¶ 81        Defendant forfeited review of this claimed error by failing to preserve it in a postsentencing motion. *Cohn*, 2014 IL App (3d) 120910, ¶ 25. Defendant does not address forfeiture as pointed out by the State and does not request plain error review of the issue. Accordingly, we agree with the State that defendant has forfeited review of the issue.

¶ 82                          2. Fundamental Fairness in Sentencing

¶ 83        Defendant argues the 50-year sentence he received was fundamentally unfair in that his sentence was grossly disparate to that of his codefendants, Spencer and Shelton. Certainly,

fundamental fairness and respect for the law mandates that similarly situated codefendants should not receive grossly disparate sentences. *People v. Fern*, 189 Ill. 2d 48, 58-59 (1999); *People v. Tate*, 122 Ill. App. 3d 660, 668 (1984). For purposes of comparing the sentences of codefendants, the term "similarly situated" has been defined as a particular defendant's rehabilitation potential or the nature and extent of the defendant's participation in the crime. *People v. Jackson*, 145 Ill. App. 3d 626, 646 (1986); See *People v. Scott*, 2012 IL App (4th) 100304, ¶ 24. Thus, a disparate sentence may be warranted by differences in the codefendants' criminal records, levels of participation in the crime, or lack of character and potential for rehabilitation. *People v. McCann*, 348 Ill. App. 3d 328, 339 (2004); see *People v. Cook*, 112 Ill. App. 3d 621, 623 (1983). A "mere disparity of sentences does not, by itself, establish a violation of fundamental fairness." *People v. Caballero*, 179 Ill. 2d 205, 216 (1997). Defendant's sentence will not be disturbed absent an abuse of discretion. *People v. Illgen*, 145 Ill. 2d 353, 379 (1991).

¶ 84    Spencer testified at trial that he received a 44-year sentence for his involvement. Unlike defendant, Spencer did not initially target the victim or take an active role in the planning process for the armed robbery. Further, the record does not reveal details about the codefendants' prior criminal histories,[8] presentence investigation reports, or other meaningful information from which to distinguish defendant from Spencer or Shelton. Based on defendant's active role in the initiation of the plans to commit this offense, we conclude this record does not support the contention that defendant's sentence was disparate from the punishment received by other codefendants. Accordingly, defendant's argument is not persuasive.

---

[8]The State asserts that neither codefendants' criminal background is contained in the record. We note that defendant's motion to reconsider sentence lists Spencer's purported criminal history, though certified copies of Spencer's convictions are not attached to the motion. Moreover, defendant neither advances an argument concerning Spencer's prior criminal record in this appeal nor cites to any portion of the record containing such information.

¶ 85                              3. As-Applied Constitutional Challenge

¶ 86        Lastly, defendant argues the 50-year sentence handed down by the trial court was excessive under the eighth and fourteenth amendments and was in violation of the proportionate penalties and rehabilitation clauses under article I, section 11 of the Illinois Constitution as applied to defendant. U.S. Const., amends. VIII and XIV; Ill. Const. 1970, art. I, § 11. Defendant argues that a growing body of scientific evidence concerning the development of the young adult brain should have required the court to take into consideration these new scientific developments before imposing defendant's sentence. Defendant requests this court to vacate his sentence and remand for a new sentencing hearing based on these theories discussed in *Miller v. Alabama*, 567 U.S. 460 (2012).

¶ 87        Our supreme court has instructed that the record must be developed sufficiently to address a defendant's as-applied constitutional challenge. *People v. Harris*, 2018 IL 121932, ¶¶ 39-48; See *People v. Bingham*, 2018 IL 122008, ¶ 22. Where the trial court has not conducted an evidentiary hearing or made findings of fact, a reviewing court is not capable of making an as-applied determination of unconstitutionality. *Harris*, 2018 IL 121932, ¶¶ 39-48. Simply stated, where the record does not contain sufficient information about defendant's history such that this court can consider the evolving science of juvenile maturity and defendant's own brain development, reviewing courts must decline review. *Id*. The record in the instant matter is underdeveloped on this specific topic. Thus, we decline to review defendant's as-applied challenge.

¶ 88        However, even if defendant were to pose a facial challenge, *Harris* holds that claims for extending *Miller* to offenders 18 years of age or older have repeatedly been rejected in this state and held that "the age of 18 marks the present line between juveniles and adults." *Id*., ¶ 61 In other

words, our supreme court explained that when an offender is over 18 years old at the time of his offense, *Miller* does not directly apply. *Id.*

¶ 89        We affirm defendant's convictions and sentence.

¶ 90                    III. CONCLUSION

¶ 91        The judgment of the circuit court of Peoria County is affirmed.

¶ 92        Affirmed.