# Illinois Official Reports

## Appellate Court

---

### *People v. Zambrano*, 2016 IL App (3d) 140178

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JESUS E. ZAMBRANO, Defendant-Appellant. |
| District & No. | Third District<br>Docket No. 3-14-0178 |
| Filed | July 20, 2016 |
| Rehearing denied | September 9, 2016 |
| Decision Under Review | Appeal from the Circuit Court of Will County, No. 09-CF-1193; the Hon. Amy Bertani-Tomczak, Judge, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | Michael J. Pelletier and Mario Kladis (argued), both of State Appellate Defender's Office, of Chicago, for appellant.<br><br>James Glasgow, State's Attorney, of Joliet (Laura E. DeMichael-Bailon (argued), of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | PRESIDING JUSTICE O'BRIEN delivered the judgment of the court, with opinion.<br>Justices McDade and Wright concurred in the judgment and opinion. |

¶ 1     Defendant Jesus Zambrano was found guilty after a jury trial of first degree murder and sentenced to 45 years' imprisonment. He appealed his conviction, arguing his trial counsel was ineffective for failing to impeach a witness as to the grant of use immunity he received before testifying and for failing to submit a jury instruction on accomplice witness testimony. We find that the record is insufficient on direct appeal to address Zambrano's claim regarding impeachment. We further find that Zambrano received ineffective assistance of counsel when defense counsel failed to submit an accomplice witness jury instruction. We reverse and remand.

¶ 2                                          FACTS

¶ 3     Defendant Jesus Zambrano was charged with two counts of first degree murder. Pedro Sanchez was also charged. The indictment alleged that on May 22, 2009, Zambrano and Sanchez shot Robert Gooch in the head with a handgun, intending to kill him (720 ILCS 5/9-1(a)(1) (West 2008)) (count I) or knowing that the act created a strong probability of death (720 ILCS 5/9-1(a)(2) (West 2008)) (count II). Zambrano was arrested in Texas, about 25 miles from the Mexico border. He was travelling with his mother and grandmother. He had shaved his head, carried no identification and told the officer who stopped their vehicle that his name was Juan. Zambrano was extradited to Illinois without objection.

¶ 4     A jury trial took place. During opening arguments, defense counsel argued that Christian Lopez, a witness for the State, was a "terrible liar," attacking his credibility on several grounds. The following evidence was then presented. The murder of Gooch took place at the Larkin Village apartment complex, which included buildings at 1007 and 1009 Lois Place. The buildings could not be accessed through each other and had separate north and south entrance/exit doors. Motion-activated cameras were mounted on each doorway.

¶ 5     Videos from the cameras on the south doors of 1007 and 1009 Lois Place were played in court. State's exhibit 3, from 1009 Lois Place, showed an Oldsmobile Cutlass sedan pulling up and parking in front of the 1009 building at 12:47 a.m. on May 22, 2009. A man got out of the front passenger seat and walked toward the building. He was wearing a white T-shirt and walked with his right hand at his side. The driver, with dark hair and wearing a hoodie, then got out of the car. As he walked to the front of the car, the backseat passenger on the driver's side reached into the front seat of the Cutlass. The driver opened the hood, reached under it, and removed something, which he put into either his waistband or hoodie pouch. The driver shut the car hood and walked toward the building. A few seconds later, the driver's side, backseat passenger left the car and followed the driver toward the building. He was also wearing a hoodie and pulled his hood over his head. A fourth man stayed in the backseat on the passenger side.

¶ 6     The video showed the man in the white T-shirt walk toward 1007 Lois Place at 12:51 a.m. Two seconds later, the driver and driver's side backseat passenger ran across the grass in front of the 1009 building. The passenger was in front of the driver and got back into the Cutlass. The driver again opened the hood and appeared to put something back under it. Approximately 10 seconds later, the man in the white T-shirt is seen running from the left behind some other cars parked by the Cutlass. He and the driver both got back into the vehicle and left.

¶ 7 Elissa Hinton testified. She was Gooch's girlfriend. He and his two sons were spending the night at her apartment on the third floor at 1007 Lois Place when he was shot. Someone buzzed her apartment after 11 p.m., when she and Gooch were sleeping. Gooch eventually got up to answer the door. He opened the door and Hinton heard voices, which she identified as Gooch and Pedro Sanchez. She had recently broken up with Sanchez after dating him for three months while she was in a long-term relationship with Gooch. Hinton heard Sanchez say, "It was my girl," and then heard a gunshot. When she went into the living room, she saw Gooch lifeless on the floor. She identified Sanchez from the video from the south door of 1009 Lois Place. He was wearing a white T-shirt. Hinton did not know Zambrano and did not identify him from the security camera videos.

¶ 8 A video from a McDonald's, State's exhibit No. 4, was also played for the jury. It showed Zambrano, who was driving the Cutlass, pull through the drive through at 12:36 a.m. and leave at 12:40 a.m. A Joliet police officer testified that the McDonald's is a 5 to 10 minute drive from the apartment complex. An officer who responded to the scene testified that he was informed by another resident of the building that a man in a white shirt ran down the hallway on the third floor.

¶ 9 Christian Lopez was called to testify for the State. His attorney informed the court that Lopez would invoke his fifth amendment rights if he took the stand. Attorneys for Lopez and Zambrano argued that Lopez incriminated himself when he testified at Sanchez's trial and that he could still be indicted for Gooch's murder. The State maintained that Lopez's mere presence at the murder location was not enough to sustain criminal charges. The trial court disagreed with the State, finding that Lopez was more than an eyewitness; he went to the apartment complex with Zambrano and Sanchez, entered the building with them, and left with them. The trial court granted Lopez the option of invoking his rights, reasoning he could be charged with a crime, and stating that Lopez had "a real fear and it's a real possibility, remote—if it's remote at all—but it exists." In response, the State granted Lopez use immunity, and he testified.

¶ 10 Lopez stated that he was hanging out with Zambrano, Sanchez, Michael Ortiz, and another man on May 21, 2009. They were at Latoya Ortiz's house drinking alcohol and smoking cannabis beginning at 2 p.m. Around 4 p.m., Lopez got a ride to his girlfriend's house, where he stayed until 9 p.m. Lopez and another friend then returned to Latoya's house, where Sanchez, Zambrano and Michael Ortiz were still partying. The group continued drinking and smoking until sometime between 11:30 p.m. and midnight when Lopez, Sanchez, Zambrano, and Michael Ortiz went to McDonald's. Zambrano drove Sanchez's gray Cutlass sedan. Sanchez rode in the front seat, Lopez sat in the backseat behind the driver, and Ortiz sat behind Sanchez. Lopez was intoxicated.

¶ 11 After they left the McDonald's drive through, they went to the Larkin Village apartment complex. Zambrano parked in front and he and Sanchez exited the vehicle. Zambrano told Lopez to get out of the car too. Ortiz stayed in the backseat. Zambrano opened the hood and Lopez assumed he grabbed something from under it. Lopez exited the Cutlass and followed Zambrano and Sanchez toward the apartment building. They were buzzed in, and as they entered the building, Zambrano tried to hand Lopez a gun, which he refused to take. They walked up the stairs. Lopez waited on the landing in the stairwell while Zambrano and Sanchez continued to the third floor. Lopez heard a bang about five minutes later and fled, running back to the Cutlass.

¶ 12      Lopez identified the Cutlass pulling into the lot on the security camera video from 1009 Lois Place. He also identified himself, Sanchez and Zambrano getting out of the vehicle and running back to it several minutes later. He described Zambrano and Sanchez as "real amped up, real hyped." He went to Zambrano's house and spent the night. According to Lopez, he was too scared to sleep and walked home first thing in the morning. He went voluntarily to the police station later in the day on May 22.

¶ 13      Lopez was impeached by defense counsel and admitted that he initially told the police that he was at Latoya's house, got drunk, woke up at home in bed, and did not remember how he got home. He did not mention Larkin Village or Zambrano, Sanchez, or Ortiz. He said he purposefully tried to make it sound like he was not involved in the shooting and that the other men were the perpetrators. He told the police that Zambrano grabbed something from under the hood but admitted that he did not see a gun until Zambrano tried to hand one to him in the apartment building. He described the object Zambrano grabbed from under the hood as "chrome-figured" and assumed it was a gun. He also told the police he was scared that Sanchez and Zambrano would kill him. He acknowledged that throughout his questioning by the police, he tried to make himself an "innocent bystander" and Zambrano and Sanchez "the bad guys."

¶ 14      He was also examined regarding bias. Lopez acknowledged he was on probation for an aggravated driving under the influence (DUI) conviction at the time of Gooch's murder. Since that time, he was charged with aggravated driving while license revoked (DWLR) in four cases, with possible six-year terms of imprisonment for each charge. Three of the charges were dismissed after he testified in the Sanchez trial and the fourth was reduced to a misdemeanor. At the time of Zambrano's trial, Lopez was charged with unlawful use of a weapon by a felon, with a possible sentence of 10 years in the Department of Corrections (DOC). He did not expect leniency for his pending charge. He was not charged in Gooch's murder and the State did not promise him anything in exchange for his testimony.

¶ 15      A Joliet detective testified that he went to Zambrano's house on May 22. Zambrano, Sanchez, Ortiz, and Zambrano's mother, Norma, were all present. Zambrano was questioned about the events of May 21 and told the officer he was at a friend named Claudia's house with Sanchez and Ortiz. The officer did not ask about the early hours of May 22.

¶ 16      A state trooper from Texas testified that he arrested Zambrano after noticing the vehicle Zambrano was riding in matched a BOLO (be on the lookout) alert. The stop took place approximately 26 miles from the Texas/Mexico border. Zambrano, whose head was shaved, was with his mother and grandmother. He did not have identification and said his name was "Juan."

¶ 17      Norma Zambrano testified on her son's behalf. The Joliet police searched her home on May 22 with her consent. Zambrano was home at the time, with his friends Sanchez and Lopez, whom she knew. On May 27, the police returned with a warrant and told her Zambrano was charged with murder. He was not home. Later that day, Norma, her mother, and Zambrano left town at her direction. Zambrano had no choice in the matter. She physically placed him in the car and told him to identify himself as "Juan" if asked. She admitted he shaved his own head but said it was her suggestion.

¶ 18      The security camera video from 1007 Lois Place was played for the jury. It showed Sanchez running south from the building and into the parking lot. The time frame for the activity coordinated with the video from 1009 Lois Place, which showed Sanchez entering the frame on the 1009 Lois Place video. A Joliet detective testified that Hinton identified Sanchez

- 4 -

as the man in the white T-shirt in both videos. He also said that it appeared Sanchez was holding something at his side in both videos.

¶ 19    The defense rested and both sides presented closing arguments. Defense counsel argued that Sanchez alone murdered Gooch and that Zambrano was not present for the murder. He pointed to the videos which did not show either Lopez or Zambrano entering a building but did show Zambrano arriving back at the car ahead of Sanchez. Counsel replayed the videos for the jury and argued that Lopez was the only witness to identify Zambrano as participating in the murder. Counsel recited jury instructions regarding witness credibility and argued that Lopez was not a credible witness. He suggested that Lopez received leniency on his prior charges and hoped to do so for his pending charge in exchange for his testimony.

¶ 20    The jury returned a guilty verdict on the murder count and also found that Zambrano or an accomplice was armed with a firearm. Zambrano filed posttrial motions arguing that Lopez's testimony was so incredible that a reasonable factfinder could not have found him credible. Defense counsel argued that Lopez was "completely discredited on the stand," and had "extreme bias," which was "shown by what he had to gain by testifying in the manner which he did." The trial court denied Zambrano's motion, and following a hearing, sentenced him to a 45-year term of imprisonment. Zambrano filed a motion to reconsider sentence, which the trial court also denied. Zambrano appealed.

¶ 21                                              ANALYSIS

¶ 22    The issue on appeal is whether Zambrano received ineffective assistance of counsel. He challenges defense counsel's representation regarding counsel's failures to impeach Lopez with evidence that he received immunity to testify and to tender a jury instruction for accomplice testimony. Zambrano asserts that defense counsel's failures to present evidence that Lopez was granted use immunity to testify and to tender the jury instruction on accomplice testimony constitute objectively unreasonable performance and that the unreasonable performance prejudiced him and denied him a fair trial, violating his constitutional rights.

¶ 23    A criminal defendant is entitled to effective assistance of trial counsel. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8. Trial counsel is ineffective where (1) his performance was deficient and (2) the deficient performance prejudiced the defendant such that he was denied a fair trial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *People v. Albanese*, 104 Ill. 2d 504, 525 (1984). Deficient performance is demonstrated by showing that counsel's performance fell below an objective standard of reasonableness and prejudice is shown by establishing that there is a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different. *Strickland*, 466 U.S. at 687-88, 694.

¶ 24    Use immunity provides immunity to a witness in a criminal case regarding "any information directly or indirectly derived from the production of evidence from the witness." 725 ILCS 5/106-2.5(b) (West 2008). The State can seek a grant of use immunity for a witness who has refused or is likely to refuse to testify on the basis of his fifth amendment rights. *People v. Ousley*, 235 Ill. 2d 299, 316 (2009). Counsel's failure to impeach a witness is generally considered a matter of trial strategy and will not support a claim of ineffective assistance of counsel. *People v. Salgado*, 263 Ill. App. 3d 238, 246 (1994). Where counsel completely fails to use significant impeachment evidence to impeach a key witness, such conduct may not be sound strategy and may constitute ineffective assistance. *Salgado*, 263 Ill.

App. 3d at 246-47. A defendant may rebut the presumption of trial strategy by showing that counsel's failure to impeach a witness was so unreasonable that no effective defense attorney would have pursued the strategy. *People v. Jones*, 2012 IL App (2d) 110346, ¶ 82.

¶ 25 Counsel may render ineffective assistance for failing to tender the jury instruction on accomplice testimony. *People v. Campbell*, 275 Ill. App. 3d 993, 999 (1995). The jury instruction provides:

> "When a witness says he was involved in the commission of a crime with the defendant, the testimony of that witness is subject to suspicion and should be considered by you with caution. It should be carefully examined in light of the other evidence in the case." Illinois Pattern Jury Instructions, Criminal, No. 3.17 (4th ed. 2000) (hereinafter, IPI Criminal 4th No. 3.17).

The instruction should be given when there is probable cause to believe the witness, not the defendant, was responsible for the crime as a principal or as an accessory under an accountability theory, despite his denial of involvement. *People v. Caffey*, 205 Ill. 2d 52, 116 (2001). A person may be charged as an accomplice where he participated in the crime in some part or united with the principal knowingly, voluntarily, and with common interest. *People v. Morrow*, 303 Ill. App. 3d 671, 678 (1999) (quoting *People v. Winfield*, 113 Ill. App. 3d 818, 828 (1983)).

¶ 26 A person is not accountable by his mere presence at the scene of the crime or his acquiescence in the criminal act. *Morrow*, 303 Ill. App. 3d at 679. An accomplice must participate in some part, perform some act, or owe a duty to the person in danger to make him responsible to prevent the crime. *Caffey*, 205 Ill. 2d at 117. Accomplice testimony, even when uncorroborated, may be sufficient to convict. *People v. Wilson*, 66 Ill. 2d 346, 349 (1977).

¶ 27 The testimony of accomplices should be viewed with suspicion and accepted only with great caution, especially where the witnesses were promised leniency or where the testimony was induced with a grant of immunity. *People v. Simpson*, 2013 IL App (1st) 111914, ¶ 21. Where the accomplice testifies, "strategic reasons for not requesting [the accomplice-witness instruction] typically have eluded the courts." *People v. Davis*, 353 Ill. App. 3d 790, 795 (2004).

¶ 28 Lopez was granted use immunity after he initially stated that he would invoke the fifth amendment if he was required to testify. In the discussion regarding the potential invocation of Lopez's fifth amendment rights, the State argued Lopez had no fifth amendment rights because his testimony would not incriminate him, asserting that Lopez was not charged after he spoke to the police the day after Gooch's murder or after he testified without immunity at Sanchez's trial in 2011. The State also argued that Lopez was not offered any leniency or deals for crimes he subsequently committed or for which he was later charged. Attorneys for both Lopez and Zambrano argued that Lopez was not charged with a probation violation although he admitted to breaking the terms of his probation when he testified in 2011. Four later unrelated charges for DWLR were prosecuted by a special prosecutor and resulted in dismissal of three charges and reduction of one to a misdemeanor. There was no evidence of any deal and or that the special prosecutor never contacted the State regarding a deal with Lopez.

¶ 29 During cross-examination of Lopez, defense counsel impeached Lopez with his prior inconsistent statements to the police during his initial interview. Lopez was also examined about bias regarding the criminal DWLR charges he faced after the murder, and their disposition, including dismissal and reduction of charges, which took place after his testimony

- 6 -

at the Sanchez trial. Defense counsel also used the general jury instructions regarding witness credibility to portray Lopez as a noncredible witness. Throughout the proceedings, the defense asserted that Lopez was a liar, whose testimony was impeached by his prior inconsistent statements and the videos from the apartment complex, that his pending cases were resolved favorably after his prior testimony and that he was not a believable witness.

¶ 30    Defense counsel attacked Lopez's credibility on a number of fronts but he did not question Lopez regarding the use immunity. On this record, we are unable to determine whether defense counsel's failure to raise the issue of Lopez's use immunity was the result of trial strategy or ineffective assistance of counsel. The record is inadequate as to the facts needed to decide either prong of Zambrano's ineffective assistance claim. *People v. Durgan*, 346 Ill. App. 3d 1121, 1142 (2004) (quoting *Massaro v. United States*, 538 U.S. 500, 504-05 (2003)). Accordingly, we determine whether defense counsel was ineffective for failing to raise Lopez's use immunity is an issue better determined on postconviction review. *People v. Parker*, 344 Ill. App. 3d 728, 737 (2003) (" 'Where the disposition of a defendant's ineffective assistance of counsel claim requires consideration of matters beyond the record on direct appeal, it is more appropriate that the defendant's contentions be addressed in a proceeding for postconviction relief, and the appellate court may properly decline to adjudicate the defendant's claim in his direct appeal from his criminal conviction.' " (quoting *People v. Burns*, 304 Ill. App. 3d 1, 11 (1999))).

¶ 31    We next address Zambrano's contention that counsel was ineffective for failing to submit a jury instruction on accomplice testimony. We agree. The evidence at trial and the reasonable inferences that can be drawn from the evidence establish probable cause that Lopez acted as an accomplice. Both the State and the defense offered video evidence corroborating the sequence of events in the parking lot before and after Gooch was shot. The videos show Lopez exiting the car with Zambrano and Sanchez, with Zambrano retrieving something from under the hood of the Cutlass. By his own testimony, and corroborated in part by the videos, Lopez entered the apartment building with them. He stated that he waited on the landing while the two other men continued to the next floor, where Gooch was shot. The video shows that he returned to the car at the same time as Zambrano and with the same sense of urgency. Zambrano placed something under the hood before getting back into the car. At no time did Lopez separate himself from the criminal activity, and by his own admission, he participated in it. The grant of use immunity to Lopez is further support of his role as an accomplice. There would be no need to immunize Lopez if he was not implicated in the shooting and involved in some fashion as an accomplice. We can ascertain no viable strategy for counsel's failure to submit the instruction. We thus consider that counsel's failure to tender the accomplice-witness instruction amounted to deficient performance.

¶ 32    Zambrano has also established he was prejudiced by counsel's deficient performance. Because accomplice testimony is suspect, especially here, where Lopez was testifying under a grant of use immunity, the jury should have been instructed that it should carefully scrutinize Lopez's testimony in light of his role as an accomplice. Lopez's testimony was detrimental to Zambrano in that it created the inference that Zambrano was the shooter, or at least acted in concert with the shooter. The jury could have found Lopez's testimony, even the uncorroborated portions, sufficient to convict Zambrano. It was the only evidence establishing Zambrano's participation. These circumstances, coupled with the fact that defense counsel

embraced the strategy that Lopez could not be trusted, reinforce the need for the accomplice witness instruction. There is no reasonable purpose for leaving out the instruction.

¶ 33     Counsel's failure to submit an instruction on accomplice testimony prejudiced Zambrano by depriving the jury of critical information it needed to evaluate Lopez's testimony. Because counsel's performance was deficient and prejudiced Zambrano, we find that defense counsel's failure to submit a jury instruction on accomplice testimony deprived Zambrano of effective assistance of counsel.

¶ 34                                              CONCLUSION

¶ 35     For the foregoing reasons, the judgment of the circuit court of Will County is reversed and the cause remanded.

¶ 36     Reversed and remanded.