**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2021 IL App (3d) 190117-U

Order filed July 13, 2021

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2021

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 10th Judicial Circuit, Peoria County, Illinois. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-19-0117 Circuit No. 18-CF-386 |
| | ) | |
| JAMES L. WATKINS, | ) ) | Honorable Kevin W. Lyons, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE O'BRIEN delivered the judgment of the court.
Justices Holdridge and Schmidt concurred in the judgment.

_____

**ORDER**

¶ 1    *Held*:   The defendant's second degree murder conviction was reversed and remanded because he was prejudiced by his trial counsel's ineffective assistance in failing to request two complete jury instructions.

¶ 2    The defendant, James L. Watkins, appealed his second degree murder conviction and 20 year sentence.

¶ 3                                  FACTS

¶ 4        The defendant was indicted on July 3, 2018, for second degree murder in the stabbing death of Kang Abel. The indictment alleged that the defendant caused Abel's death by stabbing Abel with a knife, knowing that such an act created a strong probability of death or great bodily harm. The indictment further alleged that the defendant stabbed Abel out of a belief that the killing was justified to prevent imminent death or great bodily harm, but that that belief was unreasonable.

¶ 5        The testimony at trial established that multiple officers with the Peoria Police Department were dispatched to the apartment complex Parkview Estates in Peoria at around 5 p.m. on July 2, 2018, in response to a call that a man had been stabbed. Officer Haley Hergenrother testified that she located Abel next to the wooded area behind the apartment complex. Abel was semi-alert and talking. Hergenrother observed that there was blood all over Abel and there was a trail of blood that led back to the apartment complex. Abel asked for help, but he did not say anything about how he received his injuries.

¶ 6        Officer Thomas Bieneman testified that he followed the blood trail from Abel to apartment H7, where there was a large pool of blood on the back porch. The door to the apartment was locked and no one answered the door. Bieneman gained entry to apartment H7 through an unlocked window. After gaining entry to the apartment, a male was found coming out of the bathroom inside the bedroom. Bieneman identified that man as the defendant. Bieneman handcuffed the defendant and began walking him out the front entrance. Bieneman testified that the defendant stated: "He tried to get $10 from me, so I stabbed him." Detective Sherrell Stinson joined Bieneman in entering apartment H7. Stinson testified that as Bieneman handcuffed the defendant, the defendant stated, "He threatened me." As Stinson was sweeping the rest of the apartment for persons, he observed a knife with blood on it in the kitchen sink. Stinson then took custody of the defendant from Bieneman, and the defendant stated, "He tried to get $10, so I shanked him." The defendant also

2

complained to Stinson that the defendant had trouble with Abel in the past and that the police did not do enough.

¶ 7        Michael Hughes, the battalion chief for the Peoria Fire Department, testified that when he was called to the scene, Abel was located behind the apartment complex in a wooded area. Abel was conscious and there was a large amount of blood around him. Hughes testified that Abel was a critical patient and his condition deteriorated during the short trip to the hospital. Abel made a few statements but no statements about how he received his injuries.

¶ 8        Dana Craig Wilson testified that he lived in apartment H7. Wilson testified that he had been good friends with the defendant for five or six years, and he had known Abel for about three years. Abel often came to Wilson's apartment to watch movies, play video games, and drink beer. According to Wilson, sometimes Abel would drink too much and Wilson would tell him to leave. Along with the defendant, the three men would hang out together. According to Wilson, the defendant and Abel would sometimes have verbal altercations, generally because Abel would try to annoy the defendant. On July 2, the defendant came to Wilson's apartment to hang out. Wilson left with his girlfriend and did not return until he was told there had been an incident at his apartment.

¶ 9        Dr. Amanda Youmans, a forensic pathologist, testified that Abel had two stab wounds to the abdomen and a cut above his left eyebrow. The stab wounds were consistent with a single-edged blade knife. One of the stab wounds perforated Abel's inferior vena cava, and Youmans opined that the cause of death was multiple stab wounds to the abdomen. Abel's blood alcohol concentration was 0.135.

¶ 10        The defendant testified that he arrived at Wilson's apartment around 3:30 p.m. on July 2, to watch a movie. Wilson left soon after and Abel showed up about 20 minutes later. Abel sat

down to wait for Wilson to come home. Abel asked the defendant several times if the defendant had cigarettes, which the defendant did not. Then Abel asked the defendant if the defendant had any money, and the defendant said he did not. The defendant testified that Abel was intoxicated and becoming aggravated while asking for cigarettes and money. The defendant testified that he suggested three times that Abel leave until Wilson returned, and Abel did not respond. Abel then got up and said "You're not putting anybody out of anywhere. I'm just going to beat your ass." According to the defendant, Abel then rushed at the defendant and put the defendant in a headlock or chokehold while the defendant was still seated. The defendant tried to reach Abel's legs, but could not. Abel then lifted the defendant up by the neck and slammed him to the floor. The defendant testified that he thought that Abel was going to break the defendant's neck and that the defendant was choking and could not breathe. The defendant reached for an ashtray to hit Abel to get him to release his grip, but his hand closed over a nearby knife instead. The defendant stabbed Abel in the abdomen, but Abel still did not release his hold on the defendant. The defendant testified that he was choking and about to pass out so he stabbed Abel a second time. Abel then released his grip but they continued to struggle on the floor. The defendant said that Abel then gave up and walked out the back door. The defendant went into the bathroom to clean a gash on his knee, and he put the knife in the kitchen sink. The defendant denied making any statements to the police at the time of his arrest. The defendant testified that he told Detective Landwehr essentially the same version of events.

¶ 11        Detective Seth Landwehr testified that he investigated the scene and found no evidence of a struggle in the living room of the apartment. He then interviewed the defendant, and the interview was videotaped. Landwehr testified that the defendant never stated that Abel was choking the defendant, or that Abel had the defendant in a chokehold or headlock, or that the defendant could

4

not breathe, or that the defendant thought that Abel was going to kill him. Landwehr also testified that the defendant never said anything about grabbing for an ashtray and finding the knife instead. Landwehr testified that the defendant stated that the defendant only stabbed Abel once in the torso and the defendant never said that he stabbed Abel more than once. The defendant did make numerous statements that Abel attacked him and that he stabbed Abel to defend himself. Landwehr also testified that the defendant stated "I should have just killed him" during the interview. At that point, Landwehr had not yet told the defendant that Abel had died.

¶ 12    On cross-examination, defense counsel asked Landwehr to confirm that the defendant never made a statement that Abel had the defendant in a chokehold, which Landwehr confirmed. Defense counsel then asked if the defendant ever mentioned a grip on or being grabbed by his throat, and Landwehr denied that defendant ever made any such statements. Both parties rested, and the trial court excused the jury for the night with the plan for closing arguments the first thing the next morning.

¶ 13    The next day, defense counsel sought to reopen proofs to recall the defendant to the stand to lay the foundation for admitting parts of the videotaped interview that contradicted Landwehr's testimony that the defendant never made a statement that Abel had choked the defendant. Defense counsel stated that he should have been more prepared, but he had not thoroughly reviewed and noted each statement made by the defendant during the interview. Defense counsel did not ask Landwehr to return to court, so defense counsel wanted the defendant to testify to lay the foundation. The trial court allowed two portions of the video to be played for the jury, with a stipulation from the parties that the two snippets were a small portion of the entire video interview. In the first portion, the defendant said that he was sitting down and Abel rushed straight at him. Abel grabbed the defendant by the head, and Abel had the defendant by the neck. In the second

5

portion, the defendant said that Abel grabbed the defendant, they were tussling, and the defendant was trying to get Abel's hands from around the defendant's neck. The trial court did not allow a third portion of the video where the defendant said that he did not owe Abel $10, but the money was not worth Abel trying to choke the defendant.

¶ 14     During closing arguments, the State argued that it was inappropriate to use a knife to end what was essentially a verbal altercation and a fistfight, telling the jury that the defendant was not allowed to use deadly force unless he believed that deadly force was being used against him. Defense counsel did not object. Defense counsel also did not object to the jury instructions tendered by the State, the defense did not tender any further instructions.

¶ 15     The jury returned a guilty verdict. The defendant was sentenced to 20 years in prison, and his motion to reconsider his sentence was denied. The defendant appealed.

¶ 16                                        ANALYSIS

¶ 17     The defendant argues that the record shows that defense counsel made numerous errors at trial due to counsel's lack of preparation, research, and legal knowledge, which denied the defendant his constitutional right to effective assistance of counsel. The defendant also contends that ineffectiveness should be presumed because counsel failed to subject the prosecution's case to meaningful adversarial testing. The State argues that the defendant failed to show a reasonable probability that, absent defense counsel's alleged errors, the outcome of his trial would have been different.

¶ 18     A criminal defendant is guaranteed the right to the effective assistance of counsel under the United States and Illinois Constitutions. U.S. Const. amends. VI; XIV; Ill. Const. 1970, art. I, § 8. To prevail on a claim of ineffective assistance of counsel, a defendant must show both that counsel's performance was deficient and that the deficient performance prejudiced the defendant.

6

*Strickland v. Washington*, 466 U.S. 668, 687 (1984). In assessing counsel's performance, reviewing courts presume that counsel's conduct was reasonable and that counsel was executing a sound trial strategy. *People v. Cloutier*, 191 Ill. 2d 392, 402 (2000). Under *Strickland*, strategic choices made after a thorough investigation into the law and facts are virtually unchallengeable, as are strategic choices made regarding the limitations of investigations. *Hinton v. Alabama*, 571 U.S. 263, 274 (2014). To demonstrate prejudice, a defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceeding would have been different. *Strickland*, 466 U.S. at 694.

¶ 19    The defendant contends that defense counsel was ineffective with regard to counsel's review of the videotape of the defendant's interrogation. Specifically, the defendant argues that defense counsel did not make a thorough review and mark down each phrase used by the defendant in the recorded interrogation until the eve of closing arguments; did not anticipate a rebuttal witness; and did not previously review the video with the defendant. The defendant acknowledges that defense counsel cross-examined the responding officers, emergency medical staff, and the medical examiner. In the discussion prior to allowing the video, in response to the trial court's question as to why defense counsel did not raise the issue as impeachment during Landwehr's testimony, defense counsel stated that he "did not know exactly what the times were" in the video and he did not want to introduce the entire recording. Defense counsel admitted that he had not done a thorough review of "marking down each phrase that was used by my client" prior to Landwehr's testimony. During the evening prior to closing arguments, defense counsel reviewed the video, and then he reviewed the video with the defendant the next morning. Defense counsel acknowledged that he should have been more prepared and should have realized that he would have the opportunity to use the video in surrebuttal. Defense counsel also did not call Landwehr

7

back into court to further cross-examine, but defense counsel sought to have the defendant lay the foundation for the video. The trial court ultimately allowed two portions of the video to be played for the jury.

¶ 20    We find that, while defense counsel was not thoroughly prepared, he did not fail to subject the prosecution's case to meaningful adversarial testing, so there is no presumption of prejudice. See *United States v. Cronic*, 466 U.S. 648, 659 (1984) ("if counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable"). The record does not indicate that defense counsel never reviewed the video, or never reviewed it with the defendant. However, while defense counsel did get the impeachment evidence before the jury, defense counsel did not directly impeach Landwehr. It would arguably have been more effective at the time Landwehr testified, but it did not lose all effectiveness by the next morning.

¶ 21    Since the defendant admittedly stabbed Abel but was claiming self-defense, the defendant's statements, at the scene, during interrogation, and in court, were critical to his defense. Thus, although failing to impeach a witness is generally considered a matter of trial strategy, there is no reasonable trial strategy that would not involve a thorough review of the interrogation, with the defendant, prior to the detective's testimony and the defendant's testimony. See *People v. Zambrano*, 2016 IL App (3d) 140178, ¶ 24. Defense counsel's performance, in that regard, was deficient. Defense counsel recognized that deficiency, though, and was able to introduce the parts of the interrogation video as impeachment prior to closing arguments. While that method was less timely, and arguably less effective, the defendant has not shown that there is a reasonable probability that the results of the proceeding would have been different based on this error alone.

¶ 22 The defendant also argues that his counsel was ineffective for failing to request: (1) the inclusion of language in Illinois Pattern Jury Instructions, Criminal, No. 24-25.06 (4th ed. 2000) (hereinafter IPI Criminal 4th) that permits the use of force likely or intended to cause great bodily harm or death to prevent the commission of a forcible felony and (2) IPI Criminal 4th No. 24-25.09X, which discusses when an individual has no duty to retreat. The goal of jury instructions, which are to be read as a whole, is to guide the jury to a verdict based on the applicable legal principles. *People v. Parker*, 223 Ill. 2d 494, 501 (2006). Counsel's choice of jury instructions, including the decision to rely on a defense to the exclusion of other defenses, is usually a matter of trial strategy. *People v. Falco*, 2014 IL App (1st) 111797, ¶ 16. However, the failure to request a specific jury instruction may rise to the level of ineffective assistance of counsel if the defendant was denied a fair trial due to the omission of the instruction. *Id.*

¶ 23 The State offered IPI Criminal 4th No. 24-25.06 but omitted the language about preventing the commission of a forcible felony. The instruction provides:

"A person is justified in the use of force when and to the extent that he reasonably believes that such conduct is necessary to defend [(himself) (another)] against the imminent use of unlawful force.

[However, a person is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent [(imminent death or great bodily harm to [(himself) (another)]) (the commission of _____)].].]" IPI Criminal 4th No. 24-25.06; see 720 ILCS 5/7-1 (West 2018).

¶ 24 The instruction given by the court included both paragraphs, but only included the first parenthetical (justification based on imminent death or great bodily harm to himself). The defendant contends that the State argued that the defendant stabbed Abel because Abel tried to rob

9

the defendant, so defense counsel should have argued for the inclusion of the second parenthetical (justification based on the commission of a forcible felony). In closing argument, the State paraphrased the justification instruction that was then given to the jury. However, the State also argued in its opening and closing arguments that the defendant stabbed Abel because Abel was trying to rob the defendant. Robbery, which occurs when a person knowingly takes property from another by the use of force or by threatening the imminent use of force, is a forcible felony. 720 ILCS 5/18-1(a), 2-8 (West 2018). The jury was never informed that the defendant's actions were justified under the law if the defendant reasonably believed that such force was necessary to prevent the robbery. The jury was similarly not informed that the State had the burden to prove beyond a reasonable doubt that the defendant was not justified in his conduct if the jury believed that Abel was attempting to commit a robbery and that the defendant's belief that force was necessary was objectively reasonable. See *People v. Pegram*, 124 Ill. 2d 166, 173 (1988) (jury was not informed that the prosecution had the burden of proving beyond reasonable doubt the elements of armed robbery but also that the defendant was not compelled in his conduct). The State contends that defense counsel was not ineffective for failing to request the inclusion of the second parenthetical because robbery was the State's version of events. The defendant did not testify that he stabbed Abel because Abel tried to rob him; the defendant testified that he stabbed Abel because of Abel's use of force and the defendant's fear for his life. However, although it was not the defendant's theory of the case, the defendant is entitled to instructions on those defenses that the evidence supports, even if the evidence is slight or inconsistent with the defendant's own testimony. *People v. Everette*, 141 Ill. 2d 147, 156 (1990). Thus, it was error for defense counsel to not request an instruction that addressed the proof in the case.

10

¶ 25 Defense counsel also failed to request IPI Criminal 4th No. 24-25.09X, which states: "A person who has not initially provoked the use of force against himself has no duty to attempt to escape the danger before using force against the aggressor." The defendant argues that the failure was an error and prejudiced the defendant in light of the State's argument that the defendant could have simply left the house. The State contends that the duty to retreat did not direct the jury's finding as to an essential element in the case and did not create a risk that the jury misunderstood the applicable law, nor was the jury deprived of critical law as the defendant contends. In addition, the State contends that the defendant cannot show prejudice, *i.e.*, that any duty to retreat had any bearing on the reasonableness of the defendant's use of deadly force.

¶ 26 IPI Criminal 4th No. 24-25.06 instructs the jury in accordance with section 7-1 of the Criminal Code of 2012 (Code) on the cases when a defendant is justified in the defense of a person. 720 ILCS 5/7-1 (West 2018). Section 7-4 of the Code describes cases when a justification defense is not available, such as when the defendant initially provokes the use of force against himself. 720 ILCS 5/7-4(b), (c) (West 2018). Since there was no evidence that the defendant was the initial aggressor, IPI Criminal 4th No. 24-25.09 was not appropriate. However, since the State argued that defendant could have left, and the defendant introduced evidence through the defendant's testimony and videotaped interrogation that Abel was the initial aggressor, the jury should have been instructed that the defendant had no duty to attempt to escape before using force against Abel in accordance with IPI Criminal 4th No. 24-25.09X. *People v. Hughes*, 46 Ill. App. 3d 490 (1977). As noted above, a defendant is entitled to instructions on those defenses that the evidence supports. *Everette*, 141 Ill. 2d at 156. Since there was evidence to support both of these instructions, and not requesting the two full instructions resulted in a failure to inform the jury of essential elements of the State's burden of proof, the failure to do so was ineffective assistance of counsel. These errors,

11

especially when considered in conjunction of the impeachment error, prejudiced the defense so as to deny the defendant a fair trial. See *Pegram*, 124 Ill. 2d at 172. There is a reasonable probability that but for counsel's errors the result would have been different**.** Thus, we reverse the defendant's second degree murder conviction and remand for a new trial.

¶ 27 Since we have found that the defendant was not afforded effective assistance of counsel, we need not address his other arguments. Also, since we are reversing the defendant's conviction on the grounds of ineffective assistance of counsel, we need not address the defendant's argument that his sentence should be reduced or remanded for a new sentencing hearing.

¶ 28 We find that the evidence, when viewed in the light most favorable to the prosecution, was sufficient for a rational trier of fact to find the defendant guilty of second degree murder beyond a reasonable doubt. Thus, the double jeopardy clause does not bar retrial, and this case is remanded to the trial court for retrial. See *People v. Drake*, 2019 IL 123734, ¶ 21 ("Retrial is the proper remedy if the evidence presented at the initial trial, including any improperly admitted evidence, was sufficient to sustain the conviction").

¶ 29 CONCLUSION

¶ 30 The judgment of the circuit court of Peoria County is reversed and remanded.

¶ 31 Reversed and remanded.