NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2022 IL App (4th) 210591-U

NO. 4-21-0591

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
October 4, 2022
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Livingston County |
| LUIS ROMAN, | ) | No. 18CF72 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Jennifer H. Bauknecht, |
| | ) | Judge Presiding. |

JUSTICE TURNER delivered the judgment of the court.
Justices Cavanagh and Steigmann concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The circuit court did not err by dismissing defendant's *pro se* postconviction petition at the first stage of the proceedings.

¶ 2   Defendant, Luis Roman, appeals the September 22, 2021, order of the Livingston County circuit court, summarily dismissing his *pro se* postconviction petition as frivolous and patently without merit. Defendant contends the circuit court's denial was erroneous because the petition stated the gist of a constitutional claim for ineffective assistance of counsel based on trial counsel's failure to present the videotaped surveillance footage that would have impeached the testimony of the State's witnesses. We affirm.

¶ 3                          I. BACKGROUND

¶ 4   In March 2018, a grand jury indicted defendant with one count of aggravated battery (720 ILCS 5/12-3.05(d)(4)(i) (West 2016)). The indictment alleged, on November 14,

2016, defendant, in committing a battery, knowingly made physical contact of an insulting or provoking nature with Correctional Officer Anton Frazier, in that defendant bit Frazier about the arm and he knew Frazier was an employee of the Department of Corrections (DOC) who was engaged in the performance of his authorized duties.

¶ 5          At a November 13, 2018, pretrial hearing, defendant asked to be heard on an issue concerning defense counsel.  Defendant stated, "I also asked him due to like 300-and-some documents that I sent him to file [a] motion for a challenge of arrest and my Miranda rights not being read along with other evidence and camera footage that is on this case.  And I would like to know if I could fire counsel today under ineffective assistance of counsel."  Defense counsel indicated he had discussed many of the issues raised with defendant.  As to the surveillance video, defense counsel noted, "[Y]ou can see a scuffle that occurs, but you do not see a bite that occurs."  Defense counsel had evidence that could be used for defense purposes at trial but not as grounds to have the case dismissed.  Defense counsel also indicated he was still reviewing defendant's mental health records to determine whether there was any additional defense.  After defendant explained his mental health issues, the circuit court declined to address defendant's request to proceed *pro se* until defense counsel had reviewed defendant's mental health records. Defense counsel did file a motion for a mental health examination for defendant, but at the hearing on the motion, defense counsel asked for a continuance because he no longer had concerns about defendant's fitness to stand trial.  Defendant's request to proceed *pro se* was not revisited before trial.

¶ 6          In April 2019, the circuit court commenced defendant's bench trial, which took place over three nonconsecutive days and ended in February 2020.  The evidence relevant to the issue on appeal follows.

¶ 7        Frazier testified he was a correctional officer at the Pontiac Correctional Center (Pontiac). On November 14, 2016, he and two other officers escorted defendant to his cell. According to Frazier, defendant refused to walk, so the officers had to "half carry him" to his cell. The officers placed defendant in his cell on his knees, facing the back of the cell. Defendant was restrained in handcuffs and leg irons, and Frazier crouched down to remove the leg irons. Once the leg irons were removed, defendant stood up suddenly and aggressively turned toward Frazier. According to Frazier, he put up his arm to block and push defendant away, and defendant bit Frazier's left forearm. Frazier, and two other officers, Steven Tutoky and Adrian Corley, got defendant under control and removed defendant's handcuffs through the cuffing hatch. Once defendant's restraints were removed, defendant grabbed Corley's shirt and Tutoky's hand before the officers got defendant's hands back inside the cell and secured the cuffing hatch. After the cuffing hatch was secured, Frazier reported to the health care unit where he was instructed to fill out worker's compensation forms and get a tetanus shot. Frazier testified the bite left behind an "indentation" and a "slight scrape," but he was not bleeding. Frazier denied any additional physical confrontation occurred between defendant and him. Frazier denied striking defendant.

¶ 8        Tutoky testified defendant did not want to cooperate and walk properly, so the officers had to assist him to his cell. Once in his cell, defendant was placed on his knees, and his leg irons were removed. As they were backing defendant out of his cell, Tutoky saw defendant turn around and bite Frazier's left forearm. Tutoky further testified he and Frazier and Corley got defendant under control on the ground and then removed defendant's handcuffs through the cuffing hatch. While they were on the ground, defendant attempted to spit at Corley. When asked if anything happened once defendant's handcuffs were removed, Tutoky responded, "He

did end up grabbing my hand attempting to not want to go back in; and I do believe he was grabbing at Corley's shirt maybe just with his hands behind his back; and then his hands had to be placed back in the chuckhole."

¶ 9    Corley, a lieutenant with DOC, also testified for the State.  He noted defendant was agitated and uncooperative the day of the incident.  Officers had to assist defendant to his cell, where he was ordered to go down to his knees so the leg irons could be removed.  According to Corley, Tutoky removed defendant's leg irons while Frazier had control of defendant's handcuff with a handle called a "D lead."  After the leg irons were removed, defendant stood up, spun toward Frazier, and bit Frazier.  Corley testified the officers placed defendant on the ground, eventually closed the cell door, and removed defendant's handcuffs through the cuffing hatch.  While on the ground, defendant attempted to spit at Corley, but none of defendant's saliva hit Corley.  Once the handcuffs were removed, defendant grabbed Corley's shirt and Tutoky's hand.  When the cuffing hatch was secured, the officers walked off the gallery and Corley made sure everyone was okay.  Corley observed imprints that looked like teeth marks on Frazier's arm and sent him to the healthcare unit to be checked out.

¶ 10    Additionally, Corley testified each gallery of the cellhouse had four cameras.  The cameras only showed the outside of the cells.  The cells in the gallery at issue were solid steel.  They did not have bars, and one could not see into them.  When asked if everything occurred inside the cell, Corley explained the bite and defendant being taken to the ground took place in the cell but defendant grabbing Corley's shirt and Tutoky's hands would have been outside the cell.  According to Corley, just defendant's hands would have been outside the cell.  When defendant's hands were in the cuffing hatch, Corley was standing right behind defendant, and an officer was on each side of him holding defendant's hands.  Corley testified, for the most part,

- 4 -

the officers would have been blocking the view from the camera of defendant's hands.

¶ 11    Defendant presented the testimony of Alberto Colin, an inmate at Pontiac serving a sentence for murder. Colin testified he heard a conversation between defendant and Tutoky related to Frazier's bite mark. When asked what Tutoky told defendant during this conversation, the State objected because the question called for hearsay, and the court sustained the objection. Colin testified he was not present for the November 2016 incident and only overheard a conversation had after the fact.

¶ 12    Defendant testified Frazier escorted him from place to place on November 14, 2016. That morning, defendant was in cell 336, and he had a legal call. When he returned to his cell from the legal call, defendant realized his cell had been "shook down," and he asked officers where his pictures were. According to defendant, Frazier and Tutoky escorted him "in the air" to cell 102. Defendant testified his hands were cuffed behind his back and Frazier took the leg irons off and asked defendant to stand. According to defendant, he was pushed on top of the toilet and "Frazier closed his fist and punched [defendant] three times in the face." Defendant testified, "Then after that is when they started moving me towards the front of the cell backwards; and then Anton Frazier out of the middle of nowhere put his hands when he was going to close the door around my neck; and then he was trying to choke me." Defendant denied biting Frazier and becoming angry. Defendant testified his back was toward Frazier during the incident until the cell door was closed.

¶ 13    After hearing the parties' arguments, the circuit court found defendant guilty of aggravated battery. Defendant filed a motion for a new trial and an amended motion for a new trial. At a joint June 2020 hearing, the court denied defendant's posttrial motions and sentenced him to 12 years' imprisonment. Defendant filed a motion to reconsider his sentence, which the

court denied after an August 27, 2020, hearing.

¶ 14        Defendant appealed his conviction and sentence, arguing (1) the circuit court denied defendant's constitutional right to represent himself at trial and (2) his 12-year sentence was excessive. This court affirmed the circuit court's judgment. *People v. Roman*, 2022 IL App (4th) 200414-U.

¶ 15        While his direct appeal was pending, defendant filed *pro se* a petition for relief under the Post-Conviction Hearing Act (Postconviction Act) (725 ILCS 5/122-1 *et seq.* (West 2020)) in August 2021. Defendant first asserted he was denied the effective assistance of trial counsel because counsel failed to (1) investigate, interview, and call as witnesses several individuals who could provide an alibi for defendant; (2) respond to defendant's letters; and (3) present the surveillance video footage. Defendant also asserted the State knowingly used perjured testimony, the circuit court violated his constitutional right to represent himself, ineffective assistance of appellate counsel, and actual innocence. Defendant attached numerous documents to his motion, and in his affidavit, he stated the surveillance video would need to be ordered or pulled from "evidence." He claimed the video would show Corley was in his cell longer than 30 seconds, Corley received a bath towel to wipe off defendant's blood from his hands and forearms and a green smock to cover the bath towel, and Corley kicked defendant in the hand and bent his fingers and hands through the cuffing hitch. Defendant further alleged the video would show Frazier and Tutoky were lying about not seeing Corley kick defendant or Corley wiping defendant's blood with the towel. He claimed the video would also show all three State witnesses were lying about defendant grabbing Corley's shirt and grabbing Tutoky's hand and Frazier lied about immediately leaving to see a doctor after the alleged incident. Defendant also asserted the video established his innocence.

¶ 16 On September 22, 2021, the circuit court entered a written order summarily dismissing defendant's postconviction petition. As to the video, the court noted, "by all accounts, including defendant's, the altercation took place inside the cell and the video cameras do not capture what happens inside the cells. Furthermore, the administrative record shows that the video camera footage did not capture the entire incident." The court also noted no evidence existed the video contained anything exculpatory.

¶ 17 On October 13, 2021, defendant filed a timely notice of appeal in sufficient compliance with Illinois Supreme Court Rule 606 (eff. Mar. 12, 2021). See Ill. S. Ct. R. 651(d) (eff. July 1, 2017) (providing the supreme court rules governing criminal appeals apply to appeals in postconviction proceedings). Thus, this court has jurisdiction under Illinois Supreme Court Rule 651(a) (eff. July 1, 2017).

¶ 18                                    II. ANALYSIS

¶ 19 The Postconviction Act "provides a mechanism for criminal defendants to challenge their convictions or sentences based on a substantial violation of their rights under the federal or state constitutions." *People v. Morris*, 236 Ill. 2d 345, 354, 925 N.E.2d 1069, 1074-75 (2010). A proceeding under the Postconviction Act is a collateral proceeding and not an appeal from the defendant's conviction and sentence. *People v. English*, 2013 IL 112890, ¶ 21, 987 N.E.2d 371. The defendant must show he or she suffered a substantial deprivation of his or her federal or state constitutional rights. *People v. Caballero*, 228 Ill. 2d 79, 83, 885 N.E.2d 1044, 1046 (2008).

¶ 20 The Postconviction Act establishes a three-stage process for adjudicating a postconviction petition. *English*, 2013 IL 112890, ¶ 23. Here, defendant's petition was dismissed at the first stage. At the first stage, the circuit court must review the postconviction

petition and determine whether "the petition is frivolous or is patently without merit." 725 ILCS 5/122-2.1(a)(2) (West 2020). To survive dismissal at this initial stage, the postconviction petition "need only present the gist of a constitutional claim," which is "a low threshold" that requires the petition to contain only "a limited amount of detail." *People v. Gaultney*, 174 Ill. 2d 410, 418, 675 N.E.2d 102, 106 (1996). Our supreme court has held "a *pro se* petition seeking postconviction relief under the [Postconviction] Act for a denial of constitutional rights may be summarily dismissed as frivolous or patently without merit only if the petition has no arguable basis either in law or in fact." *People v. Hodges*, 234 Ill. 2d 1, 11-12, 912 N.E.2d 1204, 1209 (2009). A petition lacks an arguable legal basis when it is based on an indisputably meritless legal theory, such as one that is completely contradicted by the record. *Hodges*, 234 Ill. 2d at 16, 912 N.E.2d at 1212. A petition lacks an arguable factual basis when it is based on a fanciful factual allegation, such as one that is clearly baseless, fantastic, or delusional. *Hodges*, 234 Ill. 2d at 16-17, 912 N.E.2d at 1212. "In considering a petition pursuant to [section 122-2.1 of the Postconviction Act], the court may examine the court file of the proceeding in which the petitioner was convicted, any action taken by an appellate court in such proceeding and any transcripts of such proceeding." 725 ILCS 5/122-2.1(c) (West 2020); see also *People v. Brown*, 236 Ill. 2d 175, 184, 923 N.E.2d 748, 754 (2010). Our review of the first-stage dismissal of a postconviction petition is *de novo*. *People v. Dunlap*, 2011 IL App (4th) 100595, ¶ 20, 963 N.E.2d 394.

¶ 21        Here, defendant asserts he raised the gist of a constitutional claim of ineffective assistance of trial counsel based on trial counsel's failure to present a videotaped surveillance footage to impeach the State's witnesses. This court analyzes ineffective assistance of counsel claims under the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v.*

*Evans*, 186 Ill. 2d 83, 93, 708 N.E.2d 1158, 1163 (1999). To obtain reversal under *Strickland*, a defendant must prove (1) counsel's performance failed to meet an objective standard of competence and (2) counsel's deficient performance resulted in prejudice to the defendant. *Evans*, 186 Ill. 2d at 93, 708 N.E.2d at 1163-64. To satisfy the deficiency prong of *Strickland*, the defendant must demonstrate counsel made errors so serious and counsel's performance was so deficient that counsel was not functioning as "counsel" guaranteed by the sixth amendment. *Evans*, 186 Ill. 2d at 93, 708 N.E.2d at 1163. Further, the defendant must overcome the strong presumption the challenged action or inaction could have been the product of sound trial strategy. *Evans*, 186 Ill. 2d at 93, 708 N.E.2d at 1163. To satisfy the prejudice prong, the defendant must prove a reasonable probability exists that, but for counsel's unprofessional errors, the proceeding's result would have been different. *Evans*, 186 Ill. 2d at 93, 708 N.E.2d at 1163-64.

¶ 22        We begin by examining whether an arguable legal basis existed for the deficiency prong of defendant's ineffective assistance of counsel claim. Defense counsel's failure to impeach a witness is generally considered a matter of trial strategy. *People v. Zambrano*, 2016 IL App (3d) 140178, ¶ 24, 64 N.E.3d 639. However, if defense counsel "completely fails to use significant impeachment evidence to impeach a key witness, such conduct may not be sound strategy and may constitute ineffective assistance." *Zambrano*, 2016 IL App (3d) 140178, ¶ 24. "A defendant may rebut the presumption of trial strategy by showing that counsel's failure to impeach a witness was so unreasonable that no effective defense attorney would have pursued the strategy." *Zambrano*, 2016 IL App (3d) 140178, ¶ 24.

¶ 23        Defendant lacked the ability to submit the video with his motion, and the circuit court does not suggest it watched the video in dismissing defendant's postconviction petition.

The record reveals the following about the video. Corley testified each gallery of Pontiac has four cameras, and the cells are solid steel. Thus, the cameras only show the outside of the cells. According to Corley, the bite and the officers taking defendant to the ground occurred inside the cell. Defendant's hands were only outside the cell when they were in the cuffing hatch. Corley further testified the officers were standing in a manner that would have, for the most part, blocked the camera's view of defendant's hands. At a pretrial hearing, defense counsel stated the video did not show a bite but did show a "scuffle."

¶ 24       Most of the testimony defendant asserts would be impeached by the surveillance video is completely contradicted by the record because the witnesses did not give the alleged testimony. As to Corley's testimony, defendant first asserts the surveillance video would impeach Corley's statement he was only in defendant's cell for 30 seconds. However, Corley never testified he was in the cell for 30 seconds. He just testified he was standing in the doorway of the cell when defendant bit Frazier. Corley then explained how he assisted in getting defendant under control in the cell and the uncuffing in the cuffing hatch. Defendant next argues the surveillance video would show Corley falsely testified he did not receive a bath towel to wipe defendant's blood from his hands and forearms and later a green smock to cover the towel. Defendant also contends Frazier and Tutoky lied about not seeing Corley's aforementioned actions. However, none of the State's witnesses were asked about a towel or a smock or blood on Corley. Defendant further asserts the surveillance video would impeach Corley's testimony he did not bend defendant's fingers or hand through the cuffing hatch. However, Corley was never questioned about bending defendant's hand or fingers in the cuffing hatch and such actions would not have been seen on the video given three officers were standing around the hatch. Defendant also claims Frazier and Tutoky lied about not seeing the bending of the hands or

- 10 -

finger. However, they were also not asked about it at trial. Defendant further contends the video would impeach all three officers' testimony defendant grabbed at Corley's shirt and Tutoky's hands, but Corley testified the position of the officers would have blocked the camera's view of defendant's hands.

¶ 25　　　　Additionally, defendant argued the surveillance video would impeach Frazier's testimony he immediately left to seek medical attention after the incident through the cuffing hatch. The video should show when Frazier left the gallery, and he testified he left once the cuffing hatch was secure. Thus, the video may impeach Frazier's testimony about when he left the gallery. Defendant also argued the surveillance video would impeach all three officers' testimony Corley did not kick defendant's hand when it was uncuffed in the cuffing hatch. Corley did deny anyone kicked defendant's hand while defendant was uncuffed in the cuffing hatch. Frazier denied anyone struck defendant during the "course of th[e] event." Tutoky was not asked about defendant being kicked or struck during the incident. Presumably, the video would show a kick to the hand outside the cuffing hatch, which would impeach Corley's and Frazier's testimony. Thus, these two bases for impeachment are not completely contradicted by the record. However, they are insignificant incidents of impeachment. A kick to an inmate's hand would not be completely out of line during a struggle through the cuffing hatch, and it is unclear how Frazier's not immediately leaving after the incident in the cuffing hatch would impact his credibility.

¶ 26　　　　Given the video arguably only impeached insignificant statements and the video showed a scuffle between defendant and the officers, it is not arguable counsel's failure to impeach the testimony of Corley and Frazier with the surveillance video was so unreasonable that no effective defense attorney would have pursued the strategy. As such, defendant's

ineffective assistance of counsel claim lacks an arguable legal basis as to the deficiency prong, and the circuit court properly found this argument was frivolous and without merit.

¶ 27                                III. CONCLUSION

¶ 28            For the reasons stated, we affirm the Livingston County circuit court's judgment.

¶ 29            Affirmed.