2022 IL App (1st) 191317-U

THIRD DIVISION
March 9, 2022

No. 1-19-1317

**NOTICE**: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 14-CR-12316 |
| | ) | |
| STEVEN DOUGLAS, | ) | Honorable |
| | ) | Domenica Stephenson, |
| Defendant-Appellant. | ) | Judge Presiding. |
| | ) | |

JUSTICE ELLIS delivered the judgment of the court.
Justices McBride and Burke concurred in the judgment.

**ORDER**

¶ 1    *Held*: Affirmed. Evidence was sufficient to convict of murder despite claim that State's primary eyewitnesses were inconsistent or impeached. Trial counsel was not ineffective.

¶ 2    What began as an exchange of insults between neighbors on South Winchester Avenue in Chicago escalated into a stabbing, and later a murder. In the late hours of August 29, 2013, Khadijah Winters and her mother, Rolanda Harvest, got into a fight with their downstairs neighbor, Rico Lawrence, and his girlfriend, Chantel Johnson. When the fight got physical, Winters stabbed Lawrence in the back and Johnson in the arm with a pocketknife.

¶ 3     The fight eventually broke up; both Lawrence and Johnson went to the hospital to tend to their wounds. They returned to the building the next day, where Johnson, Winters and Harvest continued to yell at each other. Things calmed down again, and Lawrence drove Johnson back to her house. While they were gone, Steven Douglas, the defendant here, who was Khadijah Winters's cousin, came by the house, having heard about the earlier fight. He spoke to Harvest (defendant's aunt) about what had happened, then left for the gym.

¶ 4     Later, Lawrence and defendant returned to the building at roughly the same. Another fight broke out, this time between Lawrence and several men, including defendant. The men surrounded Lawrence and repeatedly punched him until someone pulled out a gun and shot him once in the neck. Everyone fled, leaving Lawrence seizing outside the building, where he died. The State indicted defendant for Lawrence's killing, and a jury convicted him of first-degree murder and personally discharging a firearm resulting in death.

¶ 5     Now he appeals, arguing that the evidence was insufficient to prove his guilt and claiming his trial counsel was ineffective. Though the key eyewitnesses against him were impeached or inconsistent to some extent, the evidence here was enough to sustain his conviction. Nor do we find errors in trial counsel's performance. We affirm.

¶ 6                          BACKGROUND

¶ 7     In August 2013, Khadijah Winters lived with her mother, Rolanda Harvest, on the second-floor apartment on South Winchester Avenue in Chicago. Lawrence lived on the first floor. At the time, Lawrence had been dating Chantel Johnson for the previous three years. On the night of August 29, 2013, Johnson took a bus to visit with Lawrence, who picked her up at the bus stop up the street from his building. The pair walked back to his apartment, and when they got close, they saw Harvest and Harvest's boyfriend on the front porch. Earlier that day,

2

word got out that Winters and Harvest wanted to fight Johnson because of an unspecified disagreement.

¶ 8        When Lawrence and Johnson approached the building, Harvest seemed drunk, Johnson said, and blocked Lawrence from going into the apartment. Harvest believed Lawrence had spread the lie about her and her daughter wanting to fight Johnson, so she confronted him about it. The argument grew heated, and Lawrence threatened to bring people over to beat Harvest up. Then Lawrence hit Harvest in the face.

¶ 9        Upstairs, Winters heard the argument and came down to the front porch just in time to see a physical fight break out between her mother and Lawrence, culminating with Lawrence punching Harvest. Winters and Johnson then joined in, turning the fight into a brawl on the front porch. Winters pulled out a pocketknife and stabbed Lawrence in the back and Johnson in the arm. Johnson then said Winters ran back inside the house, while Harvest ran up the street. Lawrence went inside to get a gun but returned without it. Shortly thereafter, an ambulance arrived to take Lawrence and Johnson to the hospital. The police came to the house as well but did not arrest anyone.

¶ 10        Now the morning of August 30, Johnson and Lawrence went to the hospital to get treatment for their injuries, then took a bus back to Lawrence's apartment. When they got back, some of Lawrence's family members and Johnson's cousin were outside. Johnson said she saw Winters and Harvest at the second-floor window, making fun and laughing at them. Winters, on the other hand, said she was in bed when she heard Johnson and Lawrence calling her name, goading them to come outside and fight again. Johnson said she did challenge them to come down, sparking another verbal fight between the women that lasted about 15 minutes. Lawrence eventually told Johnson that Winters and Harvest were not going to come down, and that she

should "just leave it alone." Johnson and Lawrence went inside Lawrence's apartment for a while, but Johnson eventually wanted to go home and rest her arm. Lawrence and a friend drove her home.

¶ 11 Meanwhile, the defendant came by the house around 10 a.m. and hung out with Harvest. He said he heard about the fight and laughed when she told him she beat up Lawrence. He left shortly after to go to the gym but came back around noon with another man, Eric Frazier. Defendant had another laugh about the fight, then left. He returned a little while later, when Harvest and Winters had gone back inside their apartment, this time by himself, and asked for a key to the apartment. Harvest said she threw one down to him out the window.

¶ 12 At about the same time, Lawrence returned to the apartment. When he was walking in the street, Winters looked out the window and saw Lawrence, as well as some "Bloods" who were walking toward Lawrence. At trial, Winters could not remember who they were, but she said a fight broke out between the men and Lawrence. (Winters gave a slightly different story to investigators after the shooting, which we will discuss later.) Winters walked away from the window and heard a gunshot. When she went back to the window and looked out, Lawrence looked like he was having a seizure.

¶ 13 As the fight began to break out, Rashad Barr was walking near the building. He knew some people in the neighborhood, including Harvest and Winters, and was "breezing through" the area. As he approached, he saw a crowd of people he knew, including defendant on the street right in front of the building. Defendant, along with three other men, brawled with Lawrence, whom Barr knew from shooting dice in the neighborhood. At one point, defendant stood over Lawrence, who was on the ground, pulled a gun from his waist, and shot him once. Everyone, including Barr, quickly fled.

¶ 14 Harvest had heard Winters describe the fight that was breaking out on the street and told her daughter to get away from the window before bullets came through it. Harvest looked out the window briefly and saw Lawrence up in the air after someone had punched him. She moved to the door to go downstairs; she wanted to know what was happening and was afraid things were getting out of control, but she hoped she could help calm things down. Winters told her she heard a gunshot, and Harvest rushed out onto the street, where Lawrence was lying, bleeding. She tried to help stem the blood loss by placing a towel on his neck before police and an ambulance arrived. They were too late, however. Lawrence died in the street outside his apartment.

¶ 15 Shortly after the shooting, Chicago detectives Tom Vovos and Daniel Kinezle came to the scene. They interviewed witnesses, including Winters and Harvest, and asked them to come to the police station and further elaborate on what happened. Though Harvest said police forced them, the detectives and Winters both said at trial they were not compelled to go to the police station.

¶ 16 That night, Winters agreed to speak to Detective Kinezle and Assistant State's Attorney Teresa Molina. At Winters' request, Molina video-recorded the interview. In that interview (and in contrast to her trial testimony), Winters said she knew the men who beat up Lawrence, using their nicknames to identify them. The men began to punch Lawrence, Winters said, and he eventually felt to the ground and looked like he was having a seizure. One of the men, nicknamed "Wild," then said "pop that n****," and defendant pulled a gun from his pants and shot Lawrence once. Later in the interview, Winters identified defendant from a photograph.

¶ 17 At trial, Winters admitted she told Molina that defendant had shot Lawrence but claimed that she lied because police had threatened her. She "made up some stuff to go along

with what" she had heard, she said, and because she was scared the police would take her baby away. At defendant's trial, the video interview was played for the jury after Winters testified. On the video, when Molina asked Winters how she had been treated, she said police had treated her "fine."

¶ 18       In October of 2013, meanwhile, police arrested Melvin Reed on an unrelated gun charge. After his arrest, Reed spoke with a detective about Lawrence's murder, then later testified before a grand jury. Reed said that, a couple of weeks before Lawrence was murdered, he and defendant were at a restaurant at 51st and Hermitage. During the conversation, defendant said that Reed had to "watch out" for Lawrence, saying he was "just grimy, robbing people, shooting people, that type of stuff."

¶ 19       Reed saw the defendant again shortly after the shooting, near 51st and Hermitage. Reed said that the defendant had a little blood on his jogging pants. He also told a grand jury that defendant admitted he had "gotten into it" with Lawrence. Defendant told Reed he'd heard that Winters, his cousin, had been in a fight with Lawrence and stabbed him, but that Lawrence pulled out a gun and chased her and Harvest with it. A few days later, Reed and the defendant were looking at an article about Lawrence's death. The defendant pointed to the article and told Reed he "put it down." Reed told a grand jury defendant took credit for the killing, saying "that's my work. I told you I was going to have to blow that mother***er down." Although Reed omitted some of these details when he testified at defendant's trial, he admitted that what he told the grand jury was a more accurate description of what defendant told him.

¶ 20       Meanwhile, in June 2014 and nearly a year after Lawrence's murder, police arrested Barr for beating and robbing a man. When Barr was speaking with police, he revealed he had seen the shooting on August 30, 2013. Barr did not come forward until 2014 to say that he saw

the shooting.

¶ 21    A jury convicted defendant of first-degree murder and found that he personally discharged a firearm resulting in Lawrence's death.

¶ 22    At the next court hearing, defendant fired his trial counsel, Frank Kostouros, and attorney Jim DiQuartto filed an appearance to represent defendant during post-trial proceedings. Now represented by DiQuartto, Defendant later filed a motion for a new trial. That motion alleged that Kostouros was ineffective in several ways, including: (1) defendant wanted a bench trial, but counsel compelled him to have a jury hear his case; (2) counsel failed to seek a favorable plea bargain with the State; (3) counsel failed to strike Juror 19 for cause even though the juror lied about her criminal history during jury selection; (4) counsel failed to call several witnesses to impeach Barr's credibility and testimony; and (5) counsel failed to object to several pieces of evidence or testimony, including gang-related testimony and evidence that Reed saw blood on defendant's pants.

¶ 23    The court later held an evidentiary hearing into the claims, where Terrance Norris, defendant, and Kostouros all testified.

¶ 24    Norris, who was not called at defendant's trial, said that he was with Barr when Lawrence was killed but neither of them were on Winchester when Lawrence was murdered—contradicting Barr, who said he saw defendant shoot Lawrence. Norris did admit that he gave a different story to investigators and Kostouros, however, and had told them he was *not* with Barr when Lawrence was killed.

¶ 25    Defendant testified that he hired Kostouros in part because he had guaranteed he could "beat" the case. But at some point, he asked Kostouros to try to negotiate with the State and that he would plead guilty to "second degree" murder. Despite asking Kostouros three times

to negotiate with the State, Kostouros continued to say he would beat the case. The defendant also testified that he asked Kostouros to request a bench trial, but Kostouros refused to set the case for anything other than a jury trial.

¶ 26    Defendant also said that before trial, Kostouros discussed potential witnesses. Kostouros told him that many of the people who identified defendant as the shooter would not come off as trustworthy witnesses.

¶ 27    At the hearing, Kostouros refuted any allegation that the defendant had requested a bench trial or that he promised defendant he would "beat" his case. Kostouros testified that he told defendant that, in his professional judgment, a jury trial was more advantageous, but he said the decision was always his client's, and that defendant chose to have a jury trial. Kostouros also said it was the defendant who refused to consider any plea from the State and wanted, unequivocally, to have a trial.

¶ 28    Kostouros also said he believed that, through cross-examination, he had adequately attacked Barr's credibility such that using Norris would be useless. And since Norris did not see the shooting, Kostouros believed he had little, if anything, to add. As for the gang evidence, Kostouros said he thought it damaged the State's case more, since some of the State's witnesses were gang members, but there was no evidence defendant was.

¶ 29    The court denied defendant's motion. In doing so, it analyzed each of defendant's claims. Generally, it found Kostouros more credible than defendant and believed Kostouros when he said that defendant chose to have a jury trial and did not want to consider any plea from the State. The court also concluded that Kostouros had sound strategic reasons not to strike Juror 19 or call other witnesses. And as for the gang evidence and Reed's observations about blood on defendant's pants, the court concluded there was no grounds on which Kostouros could have

objected, so there was no error in not objecting.

¶ 30    After a hearing, the court sentenced defendant to a total of 55 years in prison.

¶ 31                                ANALYSIS

¶ 32    Defendant raises two challenges to his conviction. First, he argues the evidence is insufficient to support, as the State's key eyewitnesses were repeatedly impeached, conflicted with each other, or were otherwise inconsistent. Second, he says his trial counsel was ineffective for a variety of reasons.

¶ 33                        I. Sufficiency of Evidence

¶ 34    Defendant first challenges the sufficiency of the evidence. He claims that Winters and Barr, who said (in one way or another) that defendant shot Lawrence, were so incredible that it was unreasonable for the jurors to believe them. He says the same about Reed, who testified that defendant expressed disdain for Lawrence before the murder and confessed to killing him afterward.

¶ 35    The fourteenth amendment's due process clause does not allow a defendant to be convicted "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). Our ultimate question on review is whether, viewing the evidence in the light most favorable to the State, *any* rational trier of fact could have found proof of the elements of the crime beyond a reasonable doubt. *People v. Collins*, 106 Ill. 2d 237, 261 (1985); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). This standard applies in all criminal cases, regardless of the nature of the evidence. *People v. McLaurin*, 2020 IL 124563, ¶ 22.

¶ 36    When we consider a challenge to the sufficiency of the evidence resulting in a conviction, we do not retry the defendant. *People v. Smith*, 185 Ill. 2d 532, 541 (1999). The trier

of fact—here, the jury—is best equipped to judge the credibility of the witnesses, since it saw and heard them. *Id.* at 541-42. We will not substitute our judgment for that of the jury on questions involving the weight of the evidence or credibility determinations. *People v. Gray*, 2017 IL 120958, ¶ 35; *Smith*, 185 Ill. 2d at 542 (credibility findings entitled to great weight).

¶ 37     Though the fact finder's determination of witness credibility is entitled to great deference, it is not conclusive and does not bind us. *People v. Cunningham*, 212 Ill.2d 274 280 (2004). We will reverse a conviction if the evidence is so unreasonable, improbable, or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. *People v. Belknap*, 2014 IL 117094, ¶ 67.

¶ 38     The evidence here was more than sufficient, based mostly on three witnesses. Melvin Reed, the defendant's friend, testified that, before the murder, the defendant said he did not like Lawrence—giving him motive. Reed also said that the defendant confessed to the murder shortly after it happened and had blood on his pants. Rashad Barr (at trial) and Khadijha Winters (in her videotaped interview which was played at trial) said that they saw defendant shoot Lawrence. While all three had their credibility challenges, a rational person could have concluded the State proved the essential elements of the crime from their testimony.

¶ 39     Melvin Reed testified that, a few weeks before the murder, he and the defendant were at a restaurant having a meal. Defendant told Reed that he needed to "watch out for" Lawrence because he was "just grimy, robbing, people, shooting people, that type of stuff." From this, it is reasonable to infer the defendant had a personal animus against Lawrence.

¶ 40     After the murder, Reed saw defendant at 51st Street and Hermitage. The defendant had blood on his jogging pants. Reed also admitted (to the grand jury, which the trial jurors heard about) that defendant told him he "got into it with Rico[.]" A few days later, when both

men were reading about the victim's death together, defendant confessed to the crime, saying he "put it down" or bragging "that's my work. I told you I was going to have to blow that motherf***er down[.]" An unsolicited admission to the killing is extremely compelling evidence. *People v. Clay*, 349 Ill. App. 3d 24, 30 (2004) (confession is frequently "the most persuasive evidence against a defendant[.]")

¶ 41       Rashad Barr said he was "breezing through" the area at 51st and Winchester on August 30, 2013, when saw the fight on the street outside the house on South Winchester. Barr saw a number of people he knew, including defendant and Lawrence (with whom Barr had shot dice) involved in the brawl. Barr said that he saw the defendant stand over Lawrence, pull out a gun from his waistband, and fire a single shot. Barr, along with everyone else, quickly fled the scene.

¶ 42       And finally, Khadijha Winters. While at trial she professed that she only heard a shot, but did not see who fired it, she told investigators a different story. She told them she was looking out the second-floor window of her Winchester flat when "Wild," "Wood," "Freaky," and "Rashad" were walking across the street from Lawrence. Defendant was on the street as well, and a fight broke out. At some point, Wild said "pop that n*****," at which point defendant pulled out a gun and shot Lawrence once. The jury watched the video of Winters's testimony after she demonstrated her reluctance on the witness stand.

¶ 43       In sum, Reed testified to defendant's motive to harm Lawrence and his admission to doing it, while Barr and Winters said they saw defendant do it. Taken together, a rational person could conclude this defendant fired the shot that killed Lawrence.

¶ 44       Defendant says there is reason to disbelieve each witness, and he raises some valid points. For example, Reed and Barr were both convicted felons, while Winters told investigators

a different (and more detailed) story to investigators than her testimony at trial. And the defendant skillfully impeached them and tarnished their credibility before the jury. But we must give the State the benefit of all reasonable inferences from the evidence. *Cunningham*, 212 Ill. 2d at 280. So we do not fixate on a witnesses' individual blemishes; we look at the evidence as a whole and then draw reasonable inferences from it.

¶ 45       Take Winters, defendant's cousin, whose live trial testimony was rather sparce of inculpatory detail. At trial, she testified that she did not see who shot Lawrence. Her memory was also suspect on the finer details of the fight and who was involved in it. But the video of her prior statement to investigators—properly admitted as substantive evidence (725 ILCS 5/115-10.1 (West 2016))—was full of key details missing from her trial testimony. The jury watched her tell investigators that the defendant was one of the men punching the victim. When one of the men said to "pop" Lawrence, the defendant pulled a gun from his pants and shot him.

¶ 46       Defendant argues that this inconsistency renders Winters wholly unbelievable. But a rational person could have concluded that Winters feigned ignorance at trial but told investigators the truth. The jury could have viewed Winters as a "turncoat" witness—that is, a witness who says one thing before a trial, then reverses course when called to testify—which section 115-10.1 of the Code of Criminal Procedure was intended to address. *People v. Fauber*, 266 Ill. App. 3d 381, 390-91 (1994) (observing that section 115-10.1 is designed "to prevent a turncoat witness from backing away from a former statement made under circumstances indicating it was likely true by merely denying the statement.").

¶ 47       True, Winters explained the inconsistency, accusing police of coercing and threatening her when she was at the police station if she did not identify the shooter. She testified that, under duress, she lied when she implicated defendant to the police. A fair point, but the jury

heard and evaluated all of this and ultimately believed her previous testimony over her trial testimony. The jury was in a superior position to make those determinations. See *Cunningham*, 212 Ill. 2d at 283 ("[I]t is for the fact finder to judge how flaws in part of the testimony affect the credibility of the whole."). While we do not blindly adhere to what the fact finder believed, we will not upset those findings absent a compelling reason to do so.

¶ 48        Reed, too, did not tell the trial jury as much as he told a grand jury. But when confronted with his prior statements to those grand jurors, he not only admitted making them— he admitted that what he told the grand jury was what really happened. And while defendant highlights that Reed and Barr were both convicted felons, that alone does not diminish their credibility so much that no rational person would believe them. It was a piece of information for the jury to absorb along with all the other evidence. A rational juror could have concluded that Reed and Barr were being honest despite their background.

¶ 49        Lastly, defendant notes the lack of physical evidence supporting his conviction. Police did not recover any DNA, fingerprints, or even the murder weapon, much less connect anything to defendant. Another fair point, but a lack of physical evidence is not fatal to a conviction. *People v. Parker*, 2016 IL App (1st) 141597, ¶ 30.

¶ 50        The witnesses against defendant were not perfect. It is rare that they are. But viewed as a whole in the light most favorable to the State, the evidence was sufficient to convict defendant of first-degree murder.

¶ 51                                II. Ineffective Assistance

¶ 52        Defendant also attacks the performance of his trial counsel. After the jury found defendant guilty, he fired that attorney, Kostouros, and hired a new attorney to represent him. Post-trial counsel filed a comprehensive motion for a new trial, alleging Kostouros's

representation was ineffective and fell short in numerous ways. The trial court held a comprehensive hearing and heard testimony from both defendant and Kostouros, after which it made detailed findings and concluded Kostouros was not ineffective.

¶ 53    Our review of these issues is bifurcated. *People v. Bailey*, 375 Ill. App. 3d 1055, 1059 (2007).  We review the trial court's findings of fact for manifest error. *Id.* This is a deferential standard of review grounded in the reality that the trial court is in a superior position to view the witnesses's demeanor, resolve conflicts in the testimony, and determine and weigh their credibility. *People v. Sorenson*, 196 Ill. 2d 425, 431 (2001). A finding is against the manifest weight only if the opposite conclusion is clearly evident or the finding itself is unreasonable, arbitrary, or not based on the evidence presented. *Best v. Best*, 233 Ill. 2d 342, 350 (2006). But after determining whether the facts were (or were not) supported by the evidence, we apply the law to those facts and decide the ultimate question of ineffectiveness *de novo*. See *Bailey*, 375 Ill. App. 3d at 1059.

¶ 54    Trial counsel's performance is measured by the familiar two-prong test in *Strickland v. Washington*, 466 U.S. 668 (1984). See *People v. Domagala*, 2013 IL 113688, ¶ 36. To prove counsel was ineffective, a defendant must establish that (1) their attorney's actions fell below an objective standard of reasonableness; and (2) that these errors prejudiced the defendant, such that without them, there is a reasonable probability the outcome of trial would have been different. *Domagala*, 2013 IL 113688, ¶ 36.

¶ 55    To meet the first prong, the defendant must prove that "counsel's performance was objectively unreasonable under prevailing professional norms." *Id.* A defendant is entitled to competent and reasonable, but not perfect, representation. See *People v. McDonald*, 2021 IL App (1st) 190687, ¶ 30. A reviewing court is "highly deferential" in particular to decisions of trial

14

strategy; the defendant must overcome a strong presumption that counsel's trial strategy was sound. *People v. Manning*, 241 Ill. 2d 319, 334 (2011). We must make " 'every effort *** to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.' " *Id.* (quoting *Strickland*, 466 U.S. at 689).

¶ 56    A defendant must satisfy both prongs, so the failure to satisfy one prong is grounds alone to reject an ineffectiveness claim. *People v. Colon*, 225 Ill. 2d 125, 135 (2007); *People v. Graham*, 206 Ill. 2d 465, 476 (2003).

¶ 57    To begin, defendant alleges that trial counsel should have sought to strike a potential juror, whom we will refer to as Juror 19, during jury selection. "[C]ounsel's actions during jury selection are generally considered a matter of trial strategy" and are thus "virtually unchallengeable." *Manning*, 241 Ill. 2d at 333.

¶ 58    When being questioned during *voir dire*, when asked if she had any prior convictions or arrests, Juror 19 did not disclose that she had been convicted of felony theft in 2004. Juror 19 later was seated on the jury. Defendant argues that, because Juror 19 was less than truthful, she could not be unbiased or impartial, and counsel was ineffective for not striking or otherwise challenging her selection.

¶ 59    But counsel may have had a strategic reason to keep Juror 19 on the jury. In fact, the record suggests that trial counsel wanted Juror 19 on the jury. In the judge's chambers and after questioning the jurors, the State disclosed Juror 19's 2004 felony theft conviction. The State also noted that the conviction may have been related to something Juror 19 mentioned about an incident involving her daughter. The court asked Kostouros if he wanted to strike her for not disclosing the conviction; Kostouros said he had no objection to her. The trial court asked again,

to confirm, and Kostouros emphasized he did not want her stricken. It was not an oversight, in other words; the record shows that Kostouros wanted Juror 19 on the jury.

¶ 60        Further still, Kostouros *did* move to strike a different juror who failed to disclose several arrests and convictions. Defendant believes this proves that Kostouros dropped the ball when it came to Juror 19. But we see it the opposite way—it is clear that Kostouros was exercising his judgment in objecting to some but not other jurors. See *People v. Metcalfe*, 202 Ill. 2d 544, 561-62 (2002) (counsel's decision not to strike juror, when he struck two other similar jurors, highlighted that counsel's decisions were strategic.) We would add that Kostouros did not strike two other jurors who also did not fully disclose their prior arrests. Yet defendant does not challenge their selection; only Juror 19 draws his ire.

¶ 61        We are persuaded as well by the trial court's reasoning in finding that the failure to object to Juror 19 was not deficient. The court noted that a juror's undisclosed criminal history "is just another factor that the [d]efense attorney can use and take into consideration," and the court had seen many instances when neither lawyer objected to jurors who were not forthcoming about their criminal history. The court found "nothing wrong with Mr. Kostouros deciding to keep [Juror 19] because there may have been many other qualities that he saw in that *** juror that made him keep that juror." The court added that, "because this Court always gives a list of the jurors in the order that they are going to be called," counsel may have looked at "the potential jurors that were coming up next, and he may have decided that this juror was better to keep for his case than a potential juror down the road."

¶ 62        In other cases, there was at least some indication that the challenged juror *may* have harbored unfair bias. But even those reviewing courts deferred to trial counsel's strategic choices. For example, in *Manning*, 241 Ill. 2d at 323, during *voir dire*, one of the potential jurors

expressed his opinion that sex offenders should be "locked up for life." The defendant was a registered sex offender, yet his counsel did not try to remove that juror from the jury. *Id.* Our supreme court reiterated that we "should hesitate to second-guess counsel's strategic decisions, even when their decisions seem questionable." *Id.* at 335.

¶ 63      Likewise, in *People v. Begay*, 377 Ill. App. 3d 417, 423 (2016), the challenged juror said her mother had been held at knifepoint during a robbery; because of that, she could not be fair. *Id.* at 423. That woman later served on the jury and convicted the defendant, who claimed ineffective assistance on appeal. *Id.* But we wondered if defense counsel could have determined the juror would be sympathetic to their client—a woman who also claimed to have been attacked by a knife-wielding aggressor. *Id.* at 423. We reasoned that counsel may have concluded that there was a strategic reason to keep the juror, found that reasoning sound, and again reiterated that jury selection is strategic and beyond a *Strickland* challenge. *Id.*

¶ 64      Defendant cannot rebut the strong presumption that counsel's decision not to strike Juror 19 was rooted in anything but sound trial strategy. We find no error in the trial court reaching that same conclusion.

¶ 65      Defendant also claims that his counsel did not adequately impeach Rashad Barr's credibility. But again, counsel's failure to impeach a witness is generally considered a matter of trial strategy and will rarely support a claim of ineffectiveness. *People v. Salgado*, 263 Ill. App. 3d 238, 246 (1994). A defendant may rebut the presumption that this failure was strategically sound only if he can show that counsel's failure to impeach the witness was so unreasonable that no effective defense attorney would have pursued a similar strategy. *People v. Zambrano*, 2016 IL App (3d) 140178, ¶ 24.

¶ 66    The problem for defendant on this point is that trial counsel extensively attacked Barr's credibility. Recall that Barr testified that he was "breezing" through the area when he saw some men—including the defendant—beating Lawrence up. When Lawrence was lying on the ground, Barr saw defendant stand over him, pull a gun from his waistband, and fire it once. Barr then quickly fled the scene.

¶ 67    Trial counsel began by impeaching Barr with a prior felony conviction for gun possession. Counsel then pointed out that Barr did not talk to the police immediately after the shooting, despite having a "good view" of what happened. Barr admitted he only spoke to police about what he saw when they arrested him on an unrelated charge six months after the shooting. That charge was for beating someone with a group of guys—the same thing that happened to Lawrence—while trying to rob them during a "gang melee." And despite being a part of a "gang melee," Barr said he believed the State only charged him with a misdemeanor because he told investigators that defendant had shot Lawrence. Through this, counsel skillfully created more than just an inference that Barr was lying about defendant to curry favor with the State.

¶ 68    Defendant faults counsel for failing to call Terrence Norris, or "T-Bird," to testify in his defense to impeach Barr. At trial, Barr said Norris was with him when he saw defendant shoot Lawrence. But as defendant notes, Norris testified in post-trial proceedings that, on the day of Lawrence's murder, he was not with Barr—thus further impeaching Barr.

¶ 69    What is true about jury selection and whether to impeach a witness is also true about witness selection: whom to call to testify is generally a matter of trial strategy, and there is a strong presumption that trial counsel had a strategic reason not to call Norris. *See People v. Wilborn*, 2011 IL App (1st) 092802, ¶ 79 ("Decisions concerning which witnesses to call at trial and what evidence to present on defendant's behalf ultimately rest with trial counsel.")

¶ 70    At the post-trial hearing, counsel explained why he thought he didn't need Norris. Kostouros believed Barr "did a good job destroying his own credibility with his own testimony." We do not disagree with that assertion, nor could we possibly find here that defendant has overcome the strong presumption that counsel's thinking was sound.

¶ 71    Along these lines, defendant also claims that Kostouros should have called an eyewitness who would have testified that Barr was not just a witness to Lawrence's beating, but rather a participant. Defendant does not identify this witness but notes that he was mentioned in a brief exchange with Sgt. Garza during trial. Garza, who investigated Lawrence's murder, said that there was a single witness who identified Barr as one of the men who beat Lawrence. But absent a name or additional detail, we have nothing on which to consider an ineffectiveness challenge. We would add here, as the State does, that Winters, in her videotaped statement, told investigators that Barr was one of the men who beat Lawrence up. If so, then Barr *was* impeached on this very point. In any event, there is certainly nothing here to overcome the presumption of reasonable trial strategy that would attach to a decision not to call this unidentified witness.

¶ 72    Defendant also briefly argues that counsel should have impeached or refreshed the recollection of Garza when he said he could not remember various aspects of his police reports. This, he claims, would have made Barr's lies plainly apparent to the jury. But recall that Garza did admit, on redirect examination, that one witness said Barr was not a bystander but a participant in Lawrence's beating. In other words, the information defendant argues counsel should have elicited from Garza *did* come out, just not on cross-examination. So even if we cited this failure as deficient performance (we do not), defendant cannot show a reasonable likelihood

that the outcome of the trial would have been different when the jury heard that same evidence, anyway.

¶ 73    Next, defendant argues that counsel erred when he did not challenge several instances where witnesses made references to gangs. But these references were scant and fleeting, with little detail. Gang membership was not an issue at the trial, and the State's theory was that defendant shot Lawrence because he did not like him personally; the fact that those involved were gang members never came up except in passing.

¶ 74    Winters and her mother, Harvest, both testified that some "Bloods" came to beat up Lawrence. But defendant tries to make a prejudicial mountain out of a verbal molehill; while Winters referred to the men in the street as "Bloods," she did not explain what that meant or identify defendant as one of them.

¶ 75    However, during pretrial proceedings, trial counsel said he believed any gang evidence would "dirty up" the victim more than his client, since there was no testimony defendant was involved with any gangs. And indeed, defense counsel did used Rashad Barr's purported gang affiliation against him. When counsel cross-examined Winters, she reiterated that she saw some "Bloods" coming toward Lawrence, and that Barr was himself a Blood. If gang evidence was used for anything, it was used to attack Barr, not the defendant. This, too, was sound strategy and cannot be the foundation for an ineffective claim. *People v. Valladares*, 2013 IL App (1st) 112010, ¶ 90 (gang evidence was beneficial to both State and defendant, so counsel had valid strategic reason to not object to it even if that strategy proved unsuccessful).

¶ 76    Defendant next complains that counsel erred when he did not object to certain evidence at trial. First, he argues that counsel was ineffective for failing to object to Reed's testimony about seeing blood on defendant's jogging pants when defendant took Reed back to

20

the train station. According to defendant, Reed had "no personal knowledge of whether the substance on Defendant's pants were [*sic*] blood."

¶ 77　　But Reed did not need to be a doctor or nurse to testify about what he saw. "[B]loodstains are recognizable as a matter of common knowledge *** and testimony by lay witnesses that a substance is blood is admissible." *People v. Crabtree*, 162 Ill. App. 3d 632, 637 (1987); see also *People v. Loggins*, 2019 IL App (1st) 160482, ¶ 79. An objection to this testimony would have been fruitless.

¶ 78　　Next, defendant claims counsel was ineffective when he did not object to hearsay evidence during Winters's testimony. Specifically, defendant argues that it was hearsay when Winters said she heard "Wild" tell defendant to "pop that n****" right before defendant shot Lawrence. Hearsay is an out-of-court statement that is offered to establish the truth of the matter asserted. Ill. R. Evid. 801 (eff. Oct. 15, 2015); *People v. Simms*, 143 Ill. 2d 154, 173 (1991). The State obviously did not offer the words uttered by Wild—"pop that n****"—to prove the truth of those words. The testimony was not hearsay, and an objection on that ground would have been frivolous.

¶ 79　　Finally, defendant argues the cumulative effect of counsel's errors deprived him of a fair trial. As we have found no errors whatsoever, there can be no claim of cumulative error. *People v. Green*, 2017 IL App (1st) 152513, ¶ 118.

¶ 80　　　　　　　　　　　　　　　　CONCLUSION

¶ 81　　Defendant's conviction is affirmed.

¶ 82　　Affirmed.